**E-Filed 4/10/09**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DONG AH TIRE & RUBBER CO., LTD,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>GLASFORMS, INC.,<br><br>　　　　　　　Defendant/Third-Party Plaintiff.<br><br>　　v.<br><br>CTG INTERNATIONAL (NORTH AMERICA) INC., and TAISHAN FIBERGLASS, INC.,<br><br>　　　　　　　Third-Party Defendants. | Case Number C 06-3359 JF (RS)<br><br>**ORDER[1] GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY ADJUDICATION**<br><br>RE: Docket No. 151 |

## I. BACKGROUND

Plaintiff Glasforms ("Glasforms") manufactures fiber-reinforced glass insulator cores for customers worldwide who incorporate the cores into their own products. Glasforms purchases

---

[1] This disposition is not designated for publication in the official reports.

raw fiberglass for its products from a number of manufacturers. Until sometime in 2004, those manufacturers included Defendants CTG International (North America), Inc. ("CTG") and its parent corporation, Taishan Fiberglass, Inc., ("Taishan"; collectively, "Defendants"). Taishan manufactures the glass which CTG markets and sells in North America. Glasforms alleges that raw fiberglass it purchased from Defendants was contaminated with graphite, causing insulator rods that incorporated the glass to be electrically conductive and therefore to fail when energized. Defendants deny that graphite contamination caused the failures, and maintain that Glasforms' own production processes were responsible.

Glasforms alleges seven claims: (1) breach of contract for non-conforming goods; (2) breach of implied warranty of merchantability; (3) breach of implied warranty of fitness for a particular purpose; (4) strict liability for defective products; (5) negligence; (6) negligent misrepresentation; and (7) indemnification. Taishan and CTG move for summary adjudication with respect to Glasforms' strict liability claim and its claims predicated on the existence of a contract between Glasforms and Taishan. Defendants argue that summary adjudication of the products liability claim is warranted because settled law prevents the use of strict liability as a substitute for the terms of a contractual relationship negotiated in a commercial setting between sophisticated business entities. Defendants also argue that there is no privity of contract between Glasforms and Taishan that would permit recovery against Taishan on the contract-based claims. Glasforms argues that privity is unnecessary because CTG was (1) Taishan's alter ego, and/or (2) Taishan's agent. CTG now opposes its earlier-filed motion with respect to the privity argument, contending that Taishan may be held liable under an exception to the privity rule. Glasforms essentially joins in CTG's opposition to its own motion in that respect.[2]

After considering the moving and responding papers and the arguments of counsel, the Court concludes that summary adjudication in favor of Defendants is warranted with respect to the strict products liability claim, but that there remain genuine disputes of material fact

---

[2] Glasforms nonetheless "objects to this unprecedented filing by a party of an opposition to its own motion as being procedurally improper and potentially prejudicial and confusing."

2

Case No. C 06-3359 JF (RS)
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY ADJUDICATION
(JFLC3)

precluding summary adjudication of the contract claims.

## II. LEGAL STANDARD FOR SUMMARY ADJUDICATION

Summary judgment or adjudication is appropriate when there are no genuine and disputed issues of material fact and the moving party is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court must view the evidence in the light most favorably to the non-moving party, and all reasonable inferences must be drawn in favor of that party. *Torres v. City of Los Angeles*, 540 F.3d 1031, 1039-40 (9th Cir. 2008). The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324.

## III. DISCUSSION

**A.    Strict products liability claim**

It is well-settled that "as a matter of California law, the doctrine of strict liability does not apply to negotiated transactions between large commercial enterprises." *S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1239 (9th Cir. 1982). While this prohibition on the use of strict liability in a commercial contract setting is not absolute, it is "interpreted liberally, not narrowly," *Dep't of Water and Power of City of Los Angeles v. ABB Power T & D Co.*, 902 F. Supp. 1178, 1184 (C.D. Cal. 1995), since "strict liability was created to aid injured consumers 'who are powerless to protect themselves,'" *id*. (quoting *Greenman v. Yuba Power Prods., Inc.*, 59 Cal. 2d 57, 63 (1963)).

The California courts have articulated a four-part test to determine whether strict products liability is available in a commercial setting. "[T]he doctrine of products liability does not apply as between parties who: (1) deal in a commercial setting; (2) from positions of relatively equal economic strength; (3) bargain the specifications of the product; and (4) negotiate concerning the risk of loss from defects in it." *Kaiser Steel v. Westinghouse Elec. Corp.*, 55 Cal. App. 3d 737, 748 (1976); *see also Scandinavian Airlines Sys. v. United Aircraft Corp.*, 601 F.2d 425, 429 (9th Cir. 1979) (adopting four-part *Kaiser Steel* test).

**1. Commercial setting**

There can be little doubt here that the parties dealt in a commercial setting.[3] First, as the pleadings confirm, each of the parties is a business entity. Third-Party Compl., ¶ 1 ("Third-Party Plaintiff Glasforms, Inc. is . . . a corporation formed and existing under the laws of the State of California, is qualified to do business in California and has its headquarters and principal place of business located in San Jose, California."); ¶ 2 ("CTG International (North America), Inc. is a corporation organized and existing under the laws of Indiana, is qualified to do business in California, maintains a designated agent for service of process in California, and has an office located at 2198 Pomona Boulevard, Pomona, California."); ¶ 3 ("Taishan Fiberglass, Inc. is a corporation organized and existing under the laws of the People's Republic of China. . . . Taishan is the parent company of CTG and/or . . . CTG is a distributor in the United States, including the State of California, of products manufactured by Taishan."). Each party also clearly is a "merchant" within the meaning of the Uniform Commercial Code ("UCC"), a fact which confirms the existence of a commercial setting.  *See, e.g.*, *Sacramento Regional Transit Dist. v. Grumman Flxible*, 158 Cal. App.3d 289, 294-95 (1984).

**2. Relative equality of bargaining strength**

Defendants state, without any factual support, that the parties have "relatively equal" bargaining strength. Glasforms argues that this bare assertion is insufficient to support summary adjudication. While this ordinarily would be true, courts have held categorically that "businesses which are 'merchants' within the meaning of the Uniform Commercial Code have relatively equal bargaining power." *Gem Developers v. Hallcraft Homes of San Diego, Inc.*, 213

---

[3] Glasforms observes that CTG and Taishan treat themselves as one entity for purposes of arguing that "they," collectively, dealt with Glasforms as a commercial entity, but then argue that they have separate corporate identities for other purposes. The Court is troubled by Taishan's attempt to shield itself from contractual liability based on its purportedly distinct corporate identity and its simultaneous claim of unity with CTG for purposes of determining whether strict liability is available. Nonetheless, satisfaction of the first two *Kaiser* factors does not depend on whether the parties dealt *with each other*. With respect to the third and fourth factors, which do refer to the parties' relationship, a lack of privity does not preclude satisfaction of either factor, as explained *infra*.

Cal. App. 3d 419, 426, 261 (1989). While the existence of this rule ends the present inquiry, there is also evidence in the record that Glasforms' revenues have exceeded $25 million in recent years. While Glasforms claims that it is not on an equal footing with Taishan, which has annual revenues in the hundreds of millions of dollars, the relevant inquiry is whether the parties have *relatively*–not absolutely–equal bargaining strength. A review of the post-*Kaiser* case law indicates that this equality of economic strength is "relative" to that which exists between corporations and "individual consumers facing adhesion contracts." *Dep't of Water and Power*, 902 F. Supp. at 1184. Glasforms, which claims to be the "preeminent maker of insulator rods on the globe," Pfaff Depo., Cummins Decl., Ex. A, at 22:22-23:3, bears no resemblance to the individual consumer who is unable to protect himself or herself from the unfairness of adhesion contracts. "Relative" to that inequality, the parties have "equal" economic strength.

### 3. Bargaining over specifications

Glasforms claims that its unequal economic strength prevented it from bargaining over product specifications, and that the products it purchased were essentially "off the shelf." Glasforms' first claim is unsupported by any evidence. With respect to its second claim, Defendants point to a number of statements indicating that material ordered from CTG was made to specification. *See, e.g.*, Peng Depo., Dunn Decl., Ex. G, at 165:1-6 ("[T]he standard procedures, the customer tells us, you know, what they want. It's a custom-made product. . . . [W]e make samples for them. And then they . . . do [a] trial; from small trial, like one or two skids, and then go up to scale."); Li Decl., ¶ 5 ("I am informed and believe that T980S was specially made for Glasforms. It took two rounds of sample testing for the fiberglass to pass Glasforms' internal validation." ). Glasforms nonetheless maintains that the products it purchased were sold "off the shelf."

The Court need not resolve this dispute because "[u]nder Ninth Circuit interpretation of California law, actual bargaining over particular issues is unnecessary." *Dep't of Water & Power*, 902 F. Supp. at 1184-85. "[B]argaining the specifications of the product is not crucial to the conclusion that strict liability does not apply[,] . . . . [since] the primary policy implemented by strict liability is the equal distribution of risks between an individual buyer confronted with a

5

1  non-negotiable contract and a commercial seller." *S. A. Empresa De Viacao Aerea Rio*

2  *Grandense v. Boeing Co.*, 641 F.2d 746, 754 (9th Cir. 1981). Thus, Glasforms need not have

3  bargained with any party for the third *Kaiser* factor to be satisfied.

4      This principle also prevents Glasforms from arguing successfully that its lack of privity

5  with Taishan precludes satisfaction of the third *Kaiser* factor. In *Boeing*, the owner of an

6  airplane sued its manufacturer when the airplane crashed. Addressing the third *Kaiser* factor,

7  the court noted not only the absence of any record evidence indicating that the plaintiff had

8  bargained with the manufacturer regarding the specifications of the aircraft, but that it was

9  "highly unlikely that there existed an opportunity to [have] do[ne] so, as the plane was

10 purchased second-hand." *Boeing*, 641 F.2d at 754. Referring to the aforementioned policy

11 considerations underlying *Kaiser*, the court nonetheless held that strict liability did not apply

12 because bargaining of specifications was inessential where the other factors were satisfied. As

13 in *Boeing*, Glasforms' likely inability to bargain the specifications of Taishan's products with

14 Taishan itself does not defeat the application of *Kaiser* to bar strict liability.

15 **4. Negotiation of the risk of loss regarding defects**

16     It does not appear that the parties negotiated any allocation of the risk of loss. Much like

17 the third *Kaiser* prong, however, the fourth *Kaiser* prong is satisfied if the party seeking the

18 benefit of strict liability *could have negotiated* the risk of loss from defective products. *Int'l*

19 *Knights of Wine, Inc. v. Ball Corp.*, 110 Cal. App.3d 1001, 1007 n.1 (1980); *Dept. of Water and*

20 *Power*, 902 F. Supp. at 1184. It is difficult to see how Glasforms would have been prevented

21 from negotiating the risk of loss regarding defects. Glasforms argues that it

22 > could not have meaningfully controlled for, anticipated, or negotiated the risk of a
23 > subsequent, unprecedented, latent and random defects [sic] such as those
> encountered here. The standard industry tests performed by Glasforms simply
24 > could not reveal the type of contamination at issue, nor could (or should) they
> predict occasional contamination or other similar defect in future lots of the
25 > product shipped to Glasforms.

26 In essence, Glasforms is arguing that because the precise nature of the defect was

27 unascertainable at the time of bargaining, no negotiation was possible. This argument, if

28 accepted, would make Defendants Glasforms' insurers, and would render *Kaiser* meaningless in

the event that a product contained a latent defect.  Either result clearly is impermissible.

In addition, for reasons similar to those discussed in the context of the third *Kaiser* factor, Glasforms' lack of privity with Taishan does not preclude satisfaction of the fourth *Kaiser* factor.  As the court noted in *Livermore Amador Valley Wastewater Mgmt. Agency v. Nw. Pipe & Casing Co.*, 915 F. Supp. 1066, 1071 n.3 (N.D. Cal. 1995), "the fact that the parties were not in privity does not mean that the parties could not have negotiated the risk of loss, since plaintiff could have required warranties from its suppliers."  Here, similarly, "unlike the individual consumers in the California Supreme Court's product liability cases, [Glasforms] could allocate its risks of loss as well as could [the] defendant[s] . . . " *Boeing*, 641 F.2d at 754.  Accordingly, the Court finds a sufficient possibility of risk allocation to satisfy this prong of *Kaiser*.  Since all four *Kaiser* factors have been satisfied, Defendants are entitled to summary adjudication of Glasforms' strict products liability claim in their favor.

**B.    Contract-based claims**

In light of Glasforms' exclusive dealings with CTG, the parties do not dispute the lack of privity between Glasforms and Taishan.  While privity ordinarily is required to recover under a theory of contract, Glasforms argues that it may recover from Taishan because CTG was Taishan's alter ego and/or its agent.  In addition to Glasforms' arguments, CTG contends that Taishan is liable to Glasforms under an exception to the privity requirement.  As noted earlier, Glasforms essentially joins in this argument, observing that it "has substantive merit" and an "evidentiary basis."  Glasforms' Opp. at 2 n.1, 8 n.4.  The Court will address all three arguments.

**1. Alter ego**

Generally, corporations may organize for the purpose of isolating the liability of related corporate entities.  *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993).  Under California law, a subsidiary may be considered an alter ego of its parent if "(1) there is such a unity of interest that the separate personalities of the corporations no longer exist; and (2) inequitable results will follow if the corporate separateness is respected." *Brooklyn Navy Yard*

*Cogeneration Partners v. Superior Court*, 60 Cal. App. 4th 248, 257-58 (1997).[4] The determination of whether a subsidiary is the alter ego of a parent corporation is highly fact-specific. *See Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229, 1235, 1241.

### a. Unity of interest

The factors that may be considered in applying the alter ego doctrine include, but are not limited to: identical equitable ownership in the two entities; use of the same offices and employees; use of one entity as a mere shell or conduit for the affairs of the other; the commingling of funds and other assets of the two entities; identity of directors and officers; inadequate capitalization; disregard of corporate formalities; shared legal counsel; and lack of segregation of funds. *See Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 539 (2000); *Roman Catholic Archbishop v. Superior Court*, 15 Cal. App. 3d 405, 411 (1971); *see also Slottow v. Am. Cas. Co.*, 10 F.3d 1355, 1360 (9th Cir. 1993). All relevant characteristics must be considered, and no one characteristic is dispositive. *Sonora Diamond Corp.*, 83 Cal. App. 4th at 539. Glasforms focuses on the following characteristics of CTG and Taishan to demonstrate the required unity of interest:

- Taishan itself characterizes CTG as a marketing entity in service of Taishan. Thus, Taishan's website describes CTG International (North America) as "a trading company wholly owned by Taishan Fiberglass, Inc., . . . focus[ed] on sales of the products from parent company [sic], after service and purchasing required machines and raw material for parent company [sic]." Zhang Depo, Dunn Decl., Ex. B, Depo Ex. 648. Indeed, CTG does not appear to maintain an independent website. Zhang Depo., at 564:19-566:3.

---

[4] It is unclear whether federal or state law applies to the issue of whether a corporate identity should be disregarded. *See Bowoto*, 312 F. Supp. 2d at 1236 (citing *RRX Industries Inc. v. Lab-Con Inc.*, 772 F.2d 543, 550 (9th Cir. 1985)). While federal law on this point requires consideration of the fraudulent intent of the incorporators, the Ninth Circuit has held that in California cases, fraudulent intent need not be shown as long as the separate identity of the corporation has not been respected and failing to disregard the corporate identity would produce an inequitable result. *Id.*

■ "CTG" actually stands for "Chinese Taishan Glass," and the CTG® logo appearing on Taishan's website, signage, product packaging, and its physical headquarters in China is shared by CTG North America, which places it on all of its products and materials. *See* Zhang Depo., at 574:5-12; Glasforms' RJN ISO Opp. to MSJ, Ex. A; Dunn Decl., Exs. K & L; Christopher Decl., Ex. A, at 95:15-96:6 & Depo. Ex. 12 at CTG-00519.

■ CTG and Taishan are considered to be one and the same in the industry, including among CTG employees. *See* Peng Depo., Dunn Decl., Ex. G, at 129:6-14 ("Q: Do you think of CTG and Taishan as being the same company?"; A: Yes"; "[T]o us, CTG, Taishan, basically it's the same thing."); Pfaff Depo., at 50:6-9; Zhang Depo.

■ CTG considers Taishan's Chinese manufacturing plant its own and does "not make a very clear distinction" between CTG and Taishan when describing products to its customers. Li Depo., Dunn Decl., Ex. E, at 159:22-160:8, 161:1-6. Employees of both companies consistently refer to CTG/Taishan as "our company." Zhang Depo., Dunn Decl., Ex. J, Depo. Ex. 124; Li Depo., at 93:17-20.

■ CTG was established to provide a channel for Taishan's products in North America and is wholly owned by Taishan. Zhang Depo., Ex. B, at 514:11-22, 517:5-16; Li Depo., 17:22-25. CTG relies exclusively on Taishan marketing materials to sell products, and sells only products manufactured by Taishan or a Taishan joint-venture. Zhang Depo., Ex. J, at 31:20-34:6, 35:24-36:2, 87:23-88:5, Ex. B, at 517:10-16; Li Depo., at 35:2-4, 35:21-23. In addition, when CTG receives an order from a customer, the order is faxed to Taishan, which informs CTG of when the order can be filled. Taishan ordinarily ships the product directly to the customer. Zhang Depo., Ex. J, at 89:15-90:24.

■ While CTG contends that it sets its own prices, Glasforms has identified evidence that purportedly undermines this claim, including an August 2004 email

demonstrating that Taishan's sales representative consulted with CTG sales representatives regarding delivery pricing.  Ex. 663 to the Zhang Depo, Dunn Decl., Ex. B.

- ■ CTG has only two board members, one of whom is Taishan's President, the other Taishan's General Manager.  Zhang Depo., Ex. B, 533:9-535:8; Li Depo., 40:21-41:7.  In addition, CTG's two vice-presidents have been employed by Taishan, and CTG's president stated that it was "not clear" whether they still worked for Taishan.  Li Depo., 43:5-44:8.  Glasforms points to a number of other instances in which employees of Taishan and CTG have availed themselves of the "revolving door" relationship between the companies.

- ■ CTG and Taishan historically have been represented by the same attorney.  Li Depo., at 76:1-23 & Depo. Ex. 8.

- ■ CTG carries liability insurance but Taishan does not.  Zhang Depo., 711:1-712:5, 712:11-17.  Glasforms argues that if the companies truly were separate, each would have its own liability insurance.

In its reply papers, Taishan notes that Glasforms has failed to raise facts that show (1) commingling of funds or the unauthorized diversion or other misuse of corporate assets from CTG to Taishan; (2) any representation by Taishan or CTG that one is responsible for the other's debts; (3) failure of either entity to keep separate corporate documents; (4) the use of a single address for both CTG and Taishan; (5) inadequate capitalization of either CTG or Taishan; (6) any concealment of ownership of the corporation; (7) any disregard of corporate formalities or any failure to maintain arm's-length transactions; or (8) any attempt to assign all liabilities to either Taishan or CTG.  Nonetheless, in light of the complete overlap in control over the two entities, the ambiguous roles of other employees, Taishan's lack of liability insurance, the entities' representation by the same attorney, and disputes over whether Taishan sets its own prices, Glasforms has carried its Rule 56 counter-burden to demonstrate a genuine issue of material fact with respect to the relationship between CTG and Taishan for alter ego purposes.

**b. Inequitable result**

Glasforms' offers a terse but compelling explanation of why failure to disregard CTG's separate corporate identity would result in injustice:

> Taishan manufactured and sold a product that contained a latent and inherently dangerous defect. The defective product was manufactured specifically to fill Glasforms' purchase order and was shipped from Taishan's plant to Glasforms' facility. . . . Taishan cannot disavow responsibility and avoid liability by hiding behind its subsidiary.

While "injustice" clearly cannot be premised on an inability to reach the party most capable of satisfying a judgment, *see Seymour v. Hull & Moreland Engineering*, 605 F.2d 1105, 1113 (9th Cir. 1979) ("[I]nability to collect [a judgment] does not, by itself, constitute an inequitable result."), Glasforms' contention is that Taishan is equally responsible for harm caused by the insulator rod failures, and that precluding Glasforms from reaching Taishan through claims sounding in contract plainly is inequitable. The Court agrees.

**2. Agency**

"A parent corporation can be held vicariously liable for the acts of a subsidiary corporation if an agency relationship exists between the parent and the subsidiary." *Bowoto*, 312 F. Supp. 2d at 1238. "[A] corporation may become an agent of . . . another corporation . . . when it makes a contract on the other's account." *Id*. (quoting Restatement (Second) of Agency § 14 M). "Unlike liability under the alter-ego or veil-piercing test, agency liability does not require the court to disregard the corporate form[,] . . . [and] [a]gency has been a theory on which courts in this circuit have allowed plaintiffs to proceed for many decades." *Id*.

"To establish actual agency a party must demonstrate the following elements: '(1) there must be a manifestation by the principal that the agent shall act for him; (2) the agent must accept the undertaking; and (3) there must be an understanding between the parties that the principal is to be in control of the undertaking.'" *Bowoto*, 312 F. Supp. 2d at 1239 (citation omitted). The agency inquiry has been framed in several ways, including "whether the subsidiary is functioning as an incorporated arm of the parent," *id*. (citing *Gallagher v. Mazda Motor of Am.*, 781 F. Supp. 1079, 1083-84 (E.D. Pa. 1992)), or "whether the subsidiary is involved in activities that, but for the subsidiary's presence, the parent would be forced to undertake itself," *id*. (citing *Chan v.*

11

*Society Expeditions, Inc.*, 39 F.3d 1398 (9th Cir. 1994)).[5] "[A]gency liability also requires a finding that the injury allegedly inflicted by the subsidiary, for which the parent is being held liable, was within the scope of the subsidiary's authority as an agent." *Id*. (citing *Phoenix Canada Oil v. Texaco*, 842 F.2d 1466, 1477-78 (3d Cir. 1988)).

      A survey of the case law reveals at least two distinct tests.  First, the Ninth Circuit has summarized the law as follows: "The agency test is satisfied by a showing that the subsidiary functions as the parent corporation's representative in that it performs services that are 'sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.'" *Doe v. Unocal Corp.*, 248 F.3d 915, 928 (9th Cir. 2001) (quoting *Chan*, 39 F.3d at 1405).  Second, the California Court of Appeal has stated that there is an agency relationship "where the nature and extent of the control exercised over the subsidiary by the parent is so pervasive and continual that the subsidiary may be considered nothing more than an agent or instrumentality of the parent, notwithstanding the maintenance of separate corporate formalities." *Sonora Diamond Corp.*, 83 Cal. App. 4th at 541.

      Under the *Unocal* test, it can be said that CTG is Taishan's marketing conduit in North America.  CTG does not develop, manufacture, or even inventory any products.  Instead, it merely effectuates sales for Taishan, communicating the details of those sales to Taishan for specific manufacture and ultimate delivery by Taishan.  The record suggests that if CTG were not specifically incorporated, Taishan sales representatives would perform the functions that CTG sales representatives actually perform.  The "revolving door" between Taishan and CTG, described above, supports this conclusion, suggesting that in the absence of a separate entity called CTG, the same *employees* likely would conduct sales and marketing activities.  *Compare Bowoto*, 312 F. Supp. 2d at 1244 ("The revolving door . . . is dramatic evidence of the close relationship that was shared and can be viewed as further evidence of an agency relationship.").

---

[5] While these cases involved determinations of personal jurisdiction rather than parent corporation liability, the *Bowoto* Court found them "instructive on the factors courts consider when determining whether an agency relationship exists." *Bowoto*, 312 F. Supp. 2d at 1243.

1  Moreover, while not sufficient in itself, the overlap of officers and directors at Taishan and CTG
2  "is probative of the question of whether an agency finding is warranted." *Id*.
3        Similarly, under the *Sonora Diamond* test, there appears to be more than sufficient
4  "control" over CTG operations, irrespective of whether corporate formalities were respected:
5  CTG's board of directors is controlled exclusively by Taishan's management; CTG's officers and
6  directors maintain offices at Taishan's facilities in China and report regularly to Taishan about
7  CTG's operations; CTG relies exclusively on Taishan's marketing materials and product
8  descriptions and frequently buys equipment and raw material for Taishan's use; Taishan at a
9  minimum consults with CTG regarding pricing; and Taishan fills CTG's orders and ships
10 products directly from its plant to the customer. *See supra* Section III.B.1.a.  In addition, it
11 appears that Taishan holds CTG out to the public as part of its business. *See Bowoto*, 312 F.
12 Supp. 2d at 1245 ("The fact that a parent holds out to the public that a subsidiary is a department
13 of its own business increases the likelihood that the parent will be held liable for the subsidiary's
14 acts.").  CTG shares Taishan's name and logo and has no independent website or marketing
15 materials.  As noted earlier, Taishan describes CTG as its wholly owned subsidiary focused
16 exclusively on sales and services for Taishan, and employees refer to Taishan and CTG
17 interchangeably.  Accordingly, there is at least a triable issue of fact with respect to the existence
18 of an agency relationship under *Sonora Diamond.*
19       Finally, under either agency test, any liability premised on an agency relationship must
20 have arisen within the scope of that relationship.  Here, the events underlying Glasforms' claims
21 are within the scope of CTG's alleged agency relationship with Taishan.  Because the subject
22 contract-based claims all relate to glass marketed by CTG on behalf of Taishan as part of the
23 agency relationship postulated above, the final requirement for an agency relationship is satisfied.
24       **3. Express warranty exception to the privity requirement**
25       While "[t]he general rule is that privity of contract is required in an action for breach of
26 either express or implied warranty," *Burr v. Sherwin Williams Co.*, 42 Cal. 2d 682, 695 (1954), a
27 well-recognized exception to the rule exists where the purchaser of a product relies on express
28 representations made by the manufacturer in labels or other materials.  *See, e.g.*, *Clemens v.*

1  *DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008) (citing *Burr*, 42 Cal. 2d at 695-96) ; *see also Collum v. Pope & Talbot, Inc.*, 135 Cal. App. 2d 653, 656-58 (1955).  For example, where a product bears the manufacturer's printed guarantee of quality, or represents that the product has certain properties, a subsequent purchaser may sue the manufacturer even if the product was purchased through a distributor and the purchaser correspondingly lacks privity with the manufacturer.  *See, e.g.*, *Burr*, 42 Cal. 2d at 695-96 (permitting cotton growers to sue manufacturer of pesticides purchased through third-party cooperative where pesticides contained label incorrectly specifying active ingredients); *Free v. Sluss*, 87 Cal. App. 2d Supp. 933, 936-937 (1948) (permitting grocery store to sue soap manufacturer based on printed quality guarantee even though soap was purchased through distributor); *Baxter v. Ford Motor Co.*, 168 Wash. 456, (1932) (allowing car manufacturer to be held liable to purchaser based on representation that car had a seamless roof when it did not (cited for support in *Burr*, 42 Cal. 2d at 696)).  *See generally Collum*, 135 Cal. App. 2d at 656-58.

In the instant case, Glasforms' only specification in ordering fiberglass appears to have been that the glass had to be of an "electrical grade" generally referred to as "E-Glass."  *See* Hume Decl., at 46:5-20.  While Glasforms did perform initial tests on samples of glass it intended to order on a periodic basis, Fitzsimmons Decl., Ex. 7, at 84:4-89:10, according to Glasforms' Quality Assurance Manager, Miles Hume, it was both unnecessary and physically impossible to test all subsequent shipments.  *See* Hume Depo., at 43:20-44:10 ("[W]e can't test a lot of our raw materials[;] [i]t's physically impossible . . . . "); Pfaff Depo., at 86:9-16 (explaining that once initial tests are completed to qualify the glass, Glasfoms assumes that subsequent shipments meet the same quality standards).  Thus, Taishan provided Certificates of Analysis with each shipment of raw fiberglass verifying that the product shipped was E-Glass.  *See* Zhang Depo., at 229:8-230:7, 238:3-14; Fitzsimmons Decl., Ex. 9, at T00001-T00019 (Taishan Certificates of Analysis, dated June 17, 2004 through November 25, 2004).  Glasforms relied on Taishan's Certificates of Analysis.  *See* Hume Depo., at 43:20-44:10 ("When we get raw materials, we rely on our suppliers' certifications."), 81:23-82:10 ("We receive a certification from the supplier.  We check to make sure it meets the required specifications for

glass fiber. . . . Again, we're relying on what their results are because we physically cannot do a lot of these tests . . . .").

As the foregoing discussion suggests, Glasforms' contract claims against Taishan fall squarely within the express warranty exception to the privity requirement. Glasforms relied on express representations of quality with respect to each shipment of raw fiberglass. Glasforms now claims that the quality of the fiberglass it received did not conform to those representations. As such, privity is not required and Defendants' motion for summary adjudication must be denied with respect to Glasforms' first, second, and third claims.[6]

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary adjudication will be granted with respect to Glasforms' fourth claim and denied with respect to its first, second, and third claims.

**IT IS SO ORDERED.**

DATED: 4/9/09

　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　JEREMY FOGEL
　　　　　　　　　　　　　　　　　　　United States District Judge

---

[6] Aside from the merits of this argument, Taishan has conceded it by failing to file appropriate opposition. *See, e.g.*, *Greenwalt v. Ricketts*, 943 F.2d 1020, 1027 (9th Cir. 1991); *Estes v. Beta Steel Corp.*, No. 2:06-cv-221, 2006 WL 3542731, at *4 (N.D. Ind. Nov. 7, 2006); *New Grade Int'l, Inc. v. Scott Technologies*, No. C03-2628RSM, 2004 WL 5571416, at *5 (W.D. Wash. Nov. 30, 2004).

1  This Order has been served electronically upon the following persons:

2  April E. Sellers     april.sellers@bakerd.com

3  David K. Herzog     david.herzog@bakerd.com

4  Eugene Ashley     eashley@hopkinscarley.com, ihernandez@hopkinscarely.com,

5  ihernandez@hopkinscarley.com, jdooley@hopkinscarley.com

7  Jennifer M. Phelps     jennifer.phelps@bakerd.com, debora.schmid@bakerd.com

8  Kevin M. Toner     kevin.toner@bakerd.com, judy.ferber@bakerd.com

9  Lisa J. Cummins     lcummins@campbellwarburton.com

10 Noelle Dunn     gcordova@hopkinscarley.com, ndunn@hopkinscarley.com

11 Robert A. Christopher     rchristopher@hopkinscarley.com,

12 ihernandez@hopkinscarley.com

14 Sophie N. Froelich     sfroelich@nossaman.com, ntorpey@nossaman.com

15 Tod C. Gurney     tgurney@hopkinscarley.com

16 Notice has been delivered by other means to:

17 Glasforms Inc.,
18 William Whitcom Faulkner
19 McManis, Faulkner & Morgan
   50 West San Fernando St., Suite 1000
20 San Jose, CA 95113

Case No. C 06-3359 JF (RS)
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY ADJUDICATION
(JFLC3)