**\*E-Filed 7/2/09\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DONG AH TIRE & RUBBER CO., LTD., | NO. C 06-3359 JF (RS) |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SANCTIONS** |
| v. | |
| GLASFORMS, INC., | |
| Defendant/Third-Party Plaintiff, | |
| v. | |
| CTG INTERNATIONAL (NORTH AMERICA) INC., et al., | |
| Third-Party Defendants. | |

## I. INTRODUCTION

On July 2, 2008, defendant/third-party plaintiff Glasforms, Inc. ("Glasforms") filed a motion for sanctions against third-party defendant Taishan Fiberglass, Inc. ("Taishan") for the intentional spoliation and destruction of materials both when litigation was reasonably anticipated and after litigation commenced. Glasforms seeks adverse inference instructions and an award of monetary sanctions including motion related expenses. Glasforms does not seek sanctions against CTG International (North America), Inc. ("CTG").

On September 19, 2008, the Court issued an interim order noting that the record developed at that point regarding Taishan's discovery conduct presented a troubling picture. Consequently, the

1

Court requested supplemental briefing to develop the record further as to when Taishan could have reasonably anticipated litigation and the scope and timing of missing and discarded materials. In conjunction with that request, the Court directed the parties to respond to eight inquiries to assist in determining if sanctions should be assessed against Taishan. After reviewing the supplemental briefs, the extensive record submitted, and the arguments at the supplemental hearing, for the reasons set forth below, Glasforms' motion for sanctions will be granted in part and denied in part.

## II. BACKGROUND

A.  General Background

Glasforms manufactures fiberglass reinforced high voltage insulator rods. Taishan makes fiberglass. During the second half of 2004, Taishan supplied Glasforms with the fiberglass at issue in this litigation. Dunn Decl., Ex. C at 101 (Dep. Ex. 46) (indicating production dates of June 18, 2004 and September 2-3, 2004). Glasforms purchased the fiberglass from CTG, Taishan's United States distributor. Glasforms asserts that the fiberglass Taishan manufactured and CTG supplied was contaminated with graphite. Graphite contamination causes fiberglass to conduct electricity, a dangerous latent defect. Glasforms used the allegedly contaminated fiberglass to create the insulation products involved in the main action.

Taishan, CTG, and Glasforms are members of the International Organization for Standardization ("ISO"). ISO compliant companies are required to maintain records for a reasonable amount of time so that they will be able to trace root causes of problems when they occur, even if several years have elapsed. Dunn. Decl. 7/30/08, Ex. M., § 4.2.4. In accord with its ISO compliance obligations, Taishan developed a document retention policy that purports to preserve records for a certain amount of time before they are destroyed. Christopher Decl. 6/30/08, Ex. R.

On October 13, 2004, CTG learned that Glasforms suffered mysterious smoking, arcing, and fires in its rod manufacturing process, coinciding with the use of Taishan's fiberglass. Dunn Decl. 7/30/08, Ex. B at 96. Shortly thereafter, Glasforms informed Taishan's manager of quality assurance, Zhang Guo, about the problems. Zhang Decl., ¶ 11. On November 6, 2004, Glasforms experienced additional smoking and fires in its rods. Dunn Decl., Ex. E at 141-42 (Dep. Ex. 112). In December 2004, Glasforms terminated all orders for Taishan fiberglass. *Id.*, Ex. C at 112.

On December 8, 2005, one of Glasforms' customers contacted Glasforms about fifteen instances in which the insulator rods caused damage. On January 12, 2006, Glasforms filed a third party complaint advancing six claims for relief against Taishan and CTG. Taishan contends that Glasforms' own production processes caused the problems of which it complains, as evidenced by the fact that Glasforms experienced electrical failures both before and after it used Taishan's fiberglass to manufacture insulator cores.

B.  <u>Litigation Timing</u>

After Taishan became aware of Glasforms' contamination complaints in October 2004, Taishan received burned rod samples from Glasforms, which prompted Taishan to begin an investigation of its assembly line. In January/February 2005, Zhang and an engineer, Guo Xiaofeng, prepared a seventeen point report winding up that investigation. Zhang Decl., ¶ 11; Pfaff Decl. 6/27/08, ¶ 6, Ex. D. The report identifies graphite powder from Taishan's graphite rollers as the "primary" or "most likely" source of contamination. Pfaff Decl. 6/27/08, Ex. D. This report was faxed to CTG in late February or early March 2005. Zhang Decl., ¶ 11. On March 7, 2005, CTG representative, Sherry Peng, relayed to Glasforms that CTG believed graphite contamination was a source of the problems with the fiberglass. Dunn Decl., Ex. D at 111-12 (Dep. Ex. 30). This was the first suggestion to Glasforms that graphite introduced into the manufacturing process was a contributing cause of its product failures. On June 29, 2005, Glasforms confirmed by third-party testing that graphite contamination was present in Taishan's fiberglass. Pfaff Decl. 6/27/08, ¶ 7, Ex. E.

In the summer of 2005, CTG's CEO, Calvin Li, and a CTG sales representative, Milt Cunningham, traveled to Glasforms' Alabama facility to meet with Glasforms' President, Peter Pfaff. Pfaff Decl. 7/30/08, ¶ 3. After inquiring about the status of Taishan's investigation into the root causes of the failures, Pfaff learned from Li about the seventeen point report completed months earlier. Dunn Decl., Ex. I at 301-02. Pfaff demanded a copy. *Id*. at 302. At this meeting, Pfaff further informed Li and Cunningham that he expected CTG and Taishan to make Glasforms "whole" for product failures containing Taishan's fiberglass. Pfaff Decl. 7/30/08, ¶ 3. On July 18, 2005, Glasforms received a copy of the seventeen point report. Pfaff Decl. 6/27/08, ¶ 4, Ex. C.

3

On September 6, 2005, Li stated in a letter to Glasforms that the report and CTG's own technical findings confirmed an isolated case of graphite contamination. Dunn Decl., Ex. H (Dep. Ex. 13). On September 6, 2005, Glasforms sent CTG and Taishan a subcontractor corrective action request ("SCAR") required by the ISO.[1] *Id.*, Ex. J at 99-103. On September 12, 2005, Li completed and signed the SCAR that admitted graphite contamination. *Id.*, Ex. H (Dep. Ex. 68). On January 6, 2006, Pfaff sent a demand letter to Li and Taishan President, Zhang Zhifa, demanding that CTG and Taishan cover claims of Glasforms' customers who purchased insulator products made with Taishan fiberglass contaminated with graphite.[2] *Id.*, Ex. I (Dep. Ex. 353). A few days later, Glasforms initiated this litigation.

C.      Discovery Materials in Dispute

Glasforms contends that the following categories of relevant and responsive materials have been, in whole or in part, destroyed by Taishan in contravention of its discovery obligations:

1. Graphite Rollers - As noted above, graphite powder from the graphite rollers were pinpointed in Taishan's seventeen point report from January 2005 as the "primary" or "most likely" source of contamination. Taishan reports that by January 2006 the graphite rollers used to produce the 2004 fiberglass at issue were recycled or stored such that they were no longer identifiable. Christopher Decl. 6/30/08, Ex. Q at 1-2. Indeed, there is some indication that the rollers might still exist, but now it is impossible to identify which rollers were used to manufacture the fiberglass at issue.

2. Shift Change/Shift Handover Records - These records document operations during a manufacturing shift and the causes of any sudden events. *Id.*, Ex. Y at 466. The records further indicate whether the production was considered good or bad, whether any workers were absent, and the presence of any factors that influenced or impacted operations. *Id.* at 467-68. On July 5, 2005, shift change records from April 2004 to June 2004 were destroyed. Dunn Decl., Ex. K. On October

---

[1] The ISO requires a SCAR request in order to identify the cause and prevent recurrence of a problem, and such a request is required to maintain ISO certification. *Id.*, Ex. J at 100-01, Ex H at 315.

[2] The letter bears the date January 6, 2005, which appears to be a typographical error. Glasforms identifies the letter as having been generated on January 6, 2006.

4

5, 2005, records from July 2004 to September 2004 were destroyed, and on January 5, 2006, records from October 2004 to December 2004 were destroyed. *Id.* Taishan's document retention policy indicates that shift change records are to be maintained for one year. Christopher Decl. 6/30/08, Ex. R.

3. Tunnel In/Out Records - These records could indicate any incidents of burnt or blackened fiberglass. Dunn Decl., Ex. A at 367-72, Ex. B at 702. On July 5, 2005, the tunnel in/out records were destroyed for the second quarter of 2004. Taishan Decl. Concerning Document Prod. 9/24/08 ("Taishan Decl."), ¶ 1; Dunn Decl., Ex. B at 701-02. On October 8, 2006, such records were destroyed for the third quarter of 2004. Taishan Decl., ¶ 1. On January 8, 2007, records for the fourth quarter of 2004 were destroyed. *Id.* Taishan's document retention policy requires that tunnel in/out records be maintained for two years. Christopher Decl. 6/30/08, Ex. R.

4. Equipment Repair Records - These records reflect any repairs to the graphite rollers used to produce the fiberglass. *Id.*, Ex. Y at 475-76. They might have provided information regarding the replacement of Taishan's graphite rollers or the repair of Taishan's fiberglass producing ovens in the case of a fire. The earliest equipment repair records Taishan produced are dated January 1, 2005. *Id.* at 475-76. Zhang testified that such records from 2004 no longer exist. *Id.* Equipment repair records are to be kept for three years pursuant to Taishan's document retention policy. *Id.*, Ex. R.

5. Equipment Maintenance Logs - Similar to the equipment repair records, the equipment maintenance logs are potentially probative of whether any unusual events in the maintenance process introduced a contaminant into Taishan's fiberglass. On October 5, 2005, equipment maintenance logs from July 2004 to September 2004 were destroyed. Dunn Decl. Ex. K. On January 5, 2006, logs from October 2004 to December 2004 were destroyed. *Id.* Maintenance logs are to be maintained for one year according to Taishan's document retention policy. Christopher Decl. 6/30/08, Ex. R.

6. Rubber Rollers - On March 16, 2005, Taishan experimented with rubber rollers, but decided to continue using graphite. Dunn Decl., Ex. A at 120-25. On September 12, 2005, Li stated that graphite parts had been removed from Taishan's manufacturing process and replaced with rubber parts. *Id.*, Ex. H (Dep. Ex. 68). No documents relating to Taishan's experiment with rubber

5

1 rollers have been produced. According to Glasforms, information behind such experiments could
2 reveal that Taishan was aware of graphite contamination in its fiberglass.

3       7. Records Relating to the Seventeen Point Report - As noted above, the seventeen point
4 report identified graphite from Taishan's rollers as the most likely source of contamination. This
5 report was faxed to CTG. Taishan has not produced any underlying documents or correspondence
6 relating to this report such as faxes or rough drafts. Glasforms contends that any such backup
7 materials could reveal that Taishan's fiberglass suffered from defects and/or contamination.[3]

8 III.  LEGAL STANDARD

9       A court may impose sanctions as part of its inherent power to manage its docket, *Chambers
10 v. NASCO, Inc.*, 501 U.S. 32, 43 (1991), and pursuant to Rule 37 against a party who "fails to obey
11 an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A). Available sanctions include
12 monetary awards and the use of adverse inference jury instructions covering the destruction or
13 spoliation of evidence. *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991). Under the
14 Court's inherent power, a finding of "bad faith" ascribable to the party who destroyed the evidence is
15 not a prerequisite to a corrective adverse inference instruction,[4] *Unigard Sec. Ins. Co. v. Lakewood
16 Eng'g & Mfg. Corp.*, 982 F.2d 363, 368-70 & n.2 (9th Cir. 1992), but for monetary sanctions, there
17 must be a finding that the sanctioned party's behavior constituted or was tantamount to bad faith.
18 *Leon v. IDS Sys. Corp.*, 464 F.3d 951, 961 (9th Cir. 2006). For adverse inference instructions or
19 monetary sanctions imposed pursuant to Rule 37, a finding of bad faith is not required. *Hyde &
20 Drath v. Baker*, 24 F.3d 1162, 1171 (9th Cir. 1994).

21       Only a "minimum link of relevance" is required to permit the use of an adverse inference
22 instruction. *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993). Notice of "potential relevance
23 to the litigation" provides a sufficient basis for the imposition of sanctions. *Id.*; *Akiona*, 938 F.2d at
24 161. To warrant sanctions, however, the spoliation must prejudice the opposing party. *Kahaluu*,

---

[3] At the hearing, Glasforms acknowledged that the burned rod samples addressed in the interim order are no longer at issue.

[4] By contrast, spoliation that results in dismissal or entry of default judgment, an extreme sanction, must be grounded on a showing of "bad faith, or fault." *United States v. Kahaluu Constr.*, 857 F.2d 600, 603 (9th Cir. 1988).

857 F.2d at 604. Thus, an adverse inference instruction is appropriate if spoliation of evidence occurs where: (1) the evidence is destroyed after a party receives some notice that the material was potentially relevant to the litigation; and (2) prejudice to the opposing party ensues.[5]

### IV.  DISCUSSION

Glasforms claims that it has been unfairly prejudiced by Taishan's failure to maintain the relevant graphite rollers used to manufacture the fiberglass sold to Glasforms, the shift change and tunnel in/out records, the equipment repair and maintenance logs, materials underlying Taishan's experiment with rubber rollers, and correspondence and other records relating to the seventeen point report. Glasforms contends that Taishan was on notice of the potential relevance of these materials not only after litigation commenced, but also several months before when Taishan could have reasonably anticipated litigation.

A.  <u>Operative Anticipation Date</u>

As an initial matter, the operative date for when Taishan can be deemed to have reasonably anticipated litigation must be identified. Taishan claims it was not obligated to preserve relevant evidence until January 6, 2006, at the earliest; six days before Glasforms filed suit. Glasforms, on the other hand, argues that Taishan reasonably anticipated litigation either in January 2005, July 18, 2005, or at the latest, September 6, 2005.

The Ninth Circuit has not expressly defined the term "anticipated litigation," *Hynix Semiconductor Inc. v. Rambus, Inc.*, No. C-00-20905 RMW, 2006 WL 565893, at * 21, 24 (N.D. Cal. Jan. 5, 2006), and trial courts have crafted various formulations of when a party "should know" that the evidence may be relevant to future litigation. *Napster*, 462 F. Supp. 2d at 1068; *World Courier*, 2007 WL 1119196, at *1; *see Hynix Semiconductor Inc. v. Rambus, Inc.*, 591 F. Supp. 2d 1038, 1061 (N.D. Cal. 2006) (determining that future litigation is probable when it is "more than a

---

[5] Several district courts in California have used the Second Circuit's three-part test as set forth in *Residential Funding Corp. v. Degeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002), to determine whether an adverse inference instruction is appropriate for spoliation. *See, e.g.*, *World Courier v. Barone*, No. C 06-3072 TEH, 2007 WL 1119196, at *1 (N.D. Cal. April 16, 2007). The three-part test requires that the party seeking an adverse inference instruction establish that: (1) the party having control over the evidence had an obligation to preserve it; (2) the records were destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the party's claim or defense. *In re Napster, Inc.*, 462 F. Supp. 2d 1060, 1078 (N.D. Cal. 2006).

7

possibility"); *Ameripride Servs., Inc. v. Valley Indus. Serv., Inc.*, No. CIV S-00-113 LKK/JFM, 2006 WL 2308442, at *4 (E.D. Cal. Aug. 9, 2006) (placing the anticipated litigation date to when a potential claim was identified); *Hynix Semiconductor Inc. v. Rambus, Inc.*, No. C-00-20905 RMW, 2006 WL 565893, at *21, 24 (N.D. Cal. Jan. 5, 2006) (finding that litigation became "probable" when counsel was selected). Regardless of the precise terminology employed, each of these decisions recognizes that once a potential dispute matures to the point that litigation may well follow, relevant evidence should be preserved.

As noted above, at the beginning of 2005, Taishan's seventeen point report identified graphite from its rollers as the most likely source of contamination. Although Glasforms suspects that Taishan may have anticipated litigation when it first identified graphite from its own assembly line as the probable source of contamination, the record does not support this contention. For example, it was not until the summer of 2005, when Glasforms' president demanded a copy of the seventeen point report, that Taishan knew of Glasforms' customer complaints and that damages potentially were mounting, prompting Glasforms to demand that Taishan make it whole for Glasforms' product failures.

Glasforms' receipt of the seventeen point report on July 18, 2005, acknowledging graphite contamination certainly presents some indicia of "probable" litigation. At this point in time, the parties shared news of testing, field failures, graphite findings, and Taishan's incriminating investigation report.[6] On the other hand, while Taishan knew generally it might have a problem with its product at that point, the extent of the dispute had not crystalized until September 6, 2005, when Calvin Li, CTG's CEO, admitted in a letter that: "Your test report and our technical findings does confirm an isolated case of graphite contamination." Pfaff Decl. 6/27/08, Ex. G.

Upon sending this letter on September 6, 2005, and the ISO mandated SCAR that followed shortly thereafter, Taishan knew a dispute had developed, and that litigation was probable considering all the events outlined above. In those documents, Taishan affirmatively admitted that

---

[6] While Taishan argues that it tried to work cooperatively with Glasforms in reaching a solution, the facts belie that assertion. For example, instead of voluntarily divulging the seventeen point report to Glasforms as Taishan contends, Pfaff had to demand that Taishan turn it over after learning of its existence.

8

graphite was a root cause of the problems that Glasforms suffered. The documents also referenced the field failures Glasforms' customers were experiencing. These were the same field failures which Glasforms' president had discussed earlier in July 2005, and for which he conveyed his expectation that Taishan would be held responsible.

In short, by September 6, 2005, Taishan knew that Glasforms sought redress for the damages it incurred, and Taishan admitted to Glasforms that it was, at least to some degree, the source of graphite contamination. Taishan's preferred anticipated litigation date, therefore, is far too late in these series of events to serve as the operative date. While an argument, as noted above, could credibly fix upon July 18, 2005, certainly by September 6, 2005, future litigation was "probable" enough to represent the anticipated litigation date for purposes of this motion.

B.      Relevance and Prejudice

With the September triggering date as a threshold finding, the next inquiry requires a determination of whether the destroyed materials were relevant, and whether Taishan's failure to preserve the identified materials has unfairly prejudiced Glasforms.

1.      Relevance

Glasforms has demonstrated that the missing materials are potentially relevant to the underlying litigation. Among the materials Taishan lost or destroyed are a key collection of items from 2004. These are records falling within the period of time when the fiberglass sold to Glasforms was manufactured. For the graphite rollers, Glasforms has been unable to analyze and test the most probable contamination source. Taishan contends that if these rollers were critical, Glasforms should have requested them during the pre-suit investigation, sending a focused document hold letter, or sought the rollers through particularized discovery at the outset of the case. Putting the burden on Glasforms to request the rollers in order to give Taishan sufficient notice to separate the relevant rollers from other rollers is disingenuous.

The shift change and tunnel in/out records, equipment repair and maintenance logs, records dealing with the rubber rollers, and documents pertaining to the seventeen point report could indicate the circumstances of operations during the manufacturing of the fiberglass and the causes of any sudden events. In short, all of the lost items likely could have led to a determination as to the

9

source of the graphite contamination. Taishan argues that it preserved other records far more relevant on the issue of defective fiberglass. The fact remains, however, that Glasforms will never know the exact relevance of those records as they were destroyed after the anticipated litigation date, and in many instances in direct defiance of Taishan's own document retention policy.

2. <u>Prejudice</u>

Glasforms has shown that it has suffered unfair prejudice from the unavailability of the graphite rollers, shift change and tunnel in/out records, and equipment repair and maintenance logs. For the graphite rollers, Glasforms is left in the position of being unable to show by direct physical evidence precisely how the rollers could have contaminated the fiberglass at issue. *See Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 354 (9th Cir. 1995) (finding that prejudice may exist if the party charged with spoliation forces the opposing party to "rely on incomplete and spotty evidence" at trial). As for the shift change and tunnel in/out records, and equipment repair and maintenance logs, without any of these documents, Glasforms is prejudiced as it is unable to examine whether any unusual events in the manufacturing process introduced a contaminant into Taishan's fiberglass. *See Payne v. Exxon Corp.*, 121 F.3d 503, 508 (9th Cir. 1997) (determining that prejudice may exist if the destroying party's conduct prevents the opposing party from preparing for trial). Moreover, Taishan cannot suggest that these materials would be merely cumulative of other equally relevant produced documents and things.

Taishan does not dispute that the categories of documents listed above existed but have now been discarded. Records pertaining to the rubber rollers and the seventeen point report, both of which Taishan claims not to have been created in the first instance, present a different scenario. Zhang Decl., ¶ 8; Christopher Decl. 6/30/08, Ex. W at 125-27; Taishan's Opposition 7/23/08 at 13. Glasforms maintains that it is not credible that a large international ISO registered corporation, would engage in significant experiments including the possibility of replacing its graphite rollers with rubber ones, but then not document its efforts. While such a supposition is reasonable, the record is simply insufficient to warrant an award of sanctions on this basis as Glasforms presents no reason beyond speculation to question Taishan's assertion.

10

Regarding the records relating to the seventeen point report, Glasforms argues again that it simply is not plausible Taishan lacks drafts of the report, or any underlying or related records or communications. In short, Glasforms maintains that Taishan has failed to explain the absence of documents and correspondence to CTG relating to its seventeen point report. The production of the actual report which reveals that Taishan's fiberglass suffered contamination weighs against Glasforms' claim that critical material must have existed but has been destroyed. *See Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 825 (9th Cir. 2002) (the availability of other sources of evidence compensating for the despoiled evidence lessens any risk of prejudice at trial). Absent any additional showing that back-up materials to the report existed but were discarded, the notion that "they must have existed" is not enough of a basis on which to ground an award of sanctions, monetary or otherwise.

C.  <u>Materials Destroyed After Operative Date</u>

Having determined which requested materials are relevant and subject to creating unfair prejudice to Glasforms if unavailable, what remains is to pinpoint those materials destroyed by Taishan after the operative date for anticipated litigation. Where such materials are identified, the final question must be if Taishan can present any explanation that would mitigate against the imposition of sanctions.

The graphite rollers used to produce the 2004 fiberglass at issue were no longer identifiable by January 2006. This was several months after the anticipated litigation date and just one year after being pinpointed in Taishan's seventeen point report as the probable source of contamination. The shift change records from 2004 were destroyed in October 2005 and January 2006. These records were destroyed after the anticipated litigation date and prior to the one year deadline imposed by Taishan's document retention policy.[7] The equipment maintenance logs from 2004 were destroyed in October 2005 and January 2006, well inside the anticipated litigation period. While these

---

[7] On July 5, 2005, shift change records from April 2004 to June 2004 were destroyed. Dunn Decl., Ex. K. This set of records were discarded prior to the anticipated litigation date and were destroyed in compliance with the document retention policy. Accordingly no adverse inference instruction should be based on these materials.

11

documents were destroyed after the one year time period required by the document retention policy had elapsed, that does not justify their destruction soon after the anticipated litigation date.[8]

No equipment repair records from 2004 were produced and Taishan contends they no longer exist. These records are to be kept for three years pursuant to Taishan's document retention policy. The records from 2004, therefore, should have been maintained until at least 2007. Although there is no evidence indicating whether the records from 2004 were destroyed after litigation commenced, they were destroyed well in advance of the date indicated in the retention policy. Indeed, Zhang does not explain why these selected documents were destroyed or lost, but admits that the records from 2004 pertained to the production of the fiberglass sold to Glasforms. Dunn Decl., Ex. B at 702. It is indeed disturbing that records which might have revealed if any unusual events in the manufacturing process introduced a contaminant into Taishan's fiberglass have gone missing.

Similar cause for concern relates to the tunnel in/out records which were destroyed both after the anticipated litigation date and again after litigation commenced. Taishan acknowledges that tunnel in/out records from June 2004 to October 2005 were discarded in October 2006 and January 2007, well after the September 2006 anticipated litigation date. Most of these records also were destroyed in the face of Taishan's document retention policy that called for their preservation for two years.

After litigation commenced, on January 8, 2007, Taishan destroyed tunnel in/out records from the fourth quarter of 2004. Taishan's destruction of these records is particularly problematic considering that Zhang testified they might reflect incidents of burnt or blackened fiberglass. While Zhang recently has recanted his characterization of the relevance of these materials, the fact remains that with evidence already destroyed, Glasforms will never know the true content of these records.

Regardless of Zhang's re-characterization of the evidence, he still authorized the destruction of records ten months after the commencement of this litigation, and over a year after he first understood their importance. In fact, he later authorized the destruction of these records just days

---

[8] On July 5, 2005, logs from April 2004 to June 2004 were destroyed. *Id*. These logs were destroyed before the anticipated litigation date and in accordance with the retention policy. No adverse instruction, therefore, is warranted for materials discarded during this period.

12

after Glasforms specifically requested them in its first set of document requests served on January 3, 2007, and a year after the corresponding litigation hold on the destruction of materials. Christopher Decl., ¶ 8, Ex C.

As noted above, when a party destroys potentially relevant evidence, the Court need not make a finding of bad faith before imposing corrective sanctions. *See Glover*, 6 F.3d at 1329; *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 948 (9th Cir. 1993). Destruction of evidence, however, qualifies as "bad faith" when the destroying party has "some notice that the documents were potentially relevant to the litigation before they were destroyed." *Leon*, 464 F.3d at 959 (finding bad faith after plaintiff received a letter requesting that all data be preserved, and carefully wrote a program to delete data). Zhang's conduct, whether characterized as willful or negligent, is tantamount to bad faith, and constitutes the kind of "fault" sufficient to warrant sanctions. *See Unigard*, 982 F.2d at 368 n.2 (sanctions may be imposed for "willfulness or fault by the offending party").

In arguing against sanctions for its egregious discovery misconduct, Taishan contends that sanctions are not warranted on the grounds that it "by and large" followed its retention policy, it discarded materials it believed "were largely" not relevant, it did not have control over the production line from December 2006 to October 2007, and it, as a Chinese company, did not fully understand the extent of federal discovery laws in the United States. Taishan's Supp. Brief at 1, 3-5, 9-10, 14; Zhang Decl., ¶¶ 3-4. Taishan also argues that Zhang has had a resurgence of memory after recalling that the acknowledgment of graphite in the manufacturing process really was designed to placate an angry customer. Zhang Decl., ¶ 12.

Taishan's explanations fail to mitigate against the imposition of sanctions. Taishan does not dispute that the materials were responsive, and it provides no adequate explanation, and the Court can fathom none, for why the materials were not preserved. Zhang's recollection has not proven always to be reliable and it is somewhat suspicious that only the very slow dawning realization that serious sanctions would be imposed finally resulted in a key switch of story. This shift need not be taken at face value for purposes of this motion, particularly when his representations have proven to be unreliable.

13

Taishan's conduct demonstrates a level of reckless disregard to its discovery obligations. Taishan's actions were not inadvertent or beyond its control or merely negligent. To the contrary, Taishan did not even come close to making reasonable efforts to carry out its preservation of materials pursuant to its retention policy and other discovery obligations despite its explanations for failing to preserve relevant evidence. While bad faith is not required, Taishan's discovery conduct reaches that level and, at the very least, represents a cavalier and irresponsible approach to preserving and producing potentially relevant evidence.

D.      Appropriate Sanctions

Glasforms requests both monetary sanctions and the use of adverse inference jury instructions. As described below, both are warranted on the record before the Court.

1.      Adverse Inference Instructions

The Court has broad discretion to fashion, on a case-by-case basis, an appropriate adverse inference jury instruction for spoliation. *Unigard*, 982 F.2d at 367; *see Akiona*, 938 F.2d at 161 (stating that the trier of fact may draw an adverse inference from the destruction of evidence relevant to the case). In the Ninth Circuit, spoliation of evidence raises a presumption that the destroyed evidence goes to the merits of the case, and further, that such evidence was adverse to the party that destroyed it. *Phoceene Sous-Marine, S.A. v. U.S. Phosmarine, Inc.*, 682 F.2d 802, 806 (9th Cir. 1982); *see Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 557 (N.D. Cal. 1987) ("Where one party wrongfully denies another the evidence necessary to establish a fact in dispute, the court must draw the strongest allowable inferences in favor of the aggrieved party.").

The rule permitting a jury to draw an adverse inference is based on two rationales. *Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F.3d 971, 981 (9th Cir. 2009) (citing *Akonia*, 938 F.2d at 160-61). The "evidentiary rationale" recognizes the common sense proposition that a party who destroys material relevant to litigation is more likely to have been threatened by the item than someone who does not destroy it. *Akonia*, 938 F.2d at 161. The "deterrence rationale" presumes that an adverse inference will deter parties from destroying relevant evidence before it can be introduced at trial. *Id.*

Taishan's destruction of evidence is not in dispute, thereby precluding Glasforms from any opportunity to inspect the materials. Indeed, many records from exactly the time frame when the fiberglass at issue was manufactured, the very evidence that a jury could be expected to weigh in determining the source of any contamination, has been destroyed. The disappearance of the graphite rollers, for example, renders a reliable determination of the cause of the contamination difficult. As noted above, given such conduct, it is within the Court's discretion to determine that an adverse inference instruction is warranted to cure the prejudice arising in the context of this case. *Unigard*, 982 F.2d at 369.

Taishan's refusal to preserve evidence supports the "common sense proposition" that those communications were unhelpful to its case. The Court finds that Taishan's failure to preserve documents after litigation was anticipated, and its failure to comply with its own document retention policy, warrants adverse inference jury instructions for the materials identified above. The precise contours of such instructions must be left to the presiding judge who will determine the universe of jury instructions ultimately to be given in this action. The specific findings of this Court as to the categories of missing documents warranting an adverse inference instruction are set forth in the conclusion below.

### 2. Monetary Sanctions

Taishan's conduct also warrants the imposition of monetary sanctions under both Rule 37, which does not require a finding of bad faith, and pursuant to the Court's inherent power, which does. As noted above, Zhang's behavior alone in destroying the tunnel in/out records after litigation commenced qualified as an act of bad faith. An award of attorneys' fees and related costs covering Glasforms' expenses associated with developing the record on spoliation and in bringing its sanctions motion is therefore appropriate. Taishan shall reimburse Glasforms for attorney's fees and costs associated with the filing of this motion and any subsequent supplement briefings. *See Chambers*, 501 U.S. at 43. This entails fees and costs incurred in developing the record on spoliation, and time spent researching and preparing this motion. Not to be included in such an application would be expenses incurred by Glasforms in conjunction with its efforts to develop the merits of the case. Glasforms is directed to file an application and supporting declaration(s) for a

monetary award (and a proposed order) including attorneys' fees and costs within twenty days of the date of this order.  Taishan may respond within ten days of the filing of the application, and Glasforms may file a reply brief five days thereafter.

## V.  CONCLUSION

Accordingly, Glasforms' motion for sanctions is granted in part and denied in part as follows:

(1) Adverse inference instructions are warranted arising out of the spoliation of:

    (a) Graphite rollers used to manufacture the glass sold to Glasforms;

    (b) Shift change records from July 2004 to December 2004;

    (c) Tunnel in/out records from June 2004 to October 2005;

    (d) Equipment repair records from 2004; and

    (e) Equipment maintenance logs from July 2004 to December 2004.

(2) Adverse inference instructions are not warranted for the destruction, if any, of:

    (a) Shift change records from April 2004 to June 2004;

    (b) Equipment maintenance logs from April 2004 to June 2004;

    (c) Materials relating to Taishan's experiment with rubber rollers; and

    (d) Documents, underlying correspondence, or other records relating to the seventeen point report.

(3) The Court awards Glasforms reasonable attorneys' fees and related costs for developing the record on spoliation and for bringing its sanctions motion to be determined as noted above.

IT IS SO ORDERED.

Dated: 7/2/09

RICHARD SEEBORG
United States Magistrate Judge

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SANCTIONS
C 06-3359 JF (RS)

16