1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E-Filed 7/30/09**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

DONG AH TIRE & RUBBER CO., LTD,

Plaintiff,

v.

GLASFORMS, INC.,

Defendant/Third-Party Plaintiff.

v.

CTG INTERNATIONAL (NORTH AMERICA) INC., and TAISHAN FIBERGLASS, INC.,

Third-Party Defendants.

Case Number C 06-3359 JF (RS)

**ORDER[1] RE MOTIONS IN LIMINE**

RE: Docket Nos. 251, 284, 286 & 288

On June 23, 2009, the Court issued an order disposing of eleven motions in limine.  Four motions in limine currently are pending.  Subject to any necessary revision at trial, the Court now disposes of the remaining motions in limine as follows:

---

[1] This disposition is not designated for publication in the official reports.

Case No. C 06-3359 JF (RS)
ORDER RE MOTIONS IN LIMINE
(JFLC3)

1    **A.    Defendants' motion to exclude hearsay evidence**

2         To prove that it suffered damages as a result of failures caused by Defendants' fiberglass,

3    Glasforms intends to introduce certain of its written product records, known as Customer

4    Complaint & Credit Memo Forms ("CAP-3 Forms").  These records themselves incorporate

5    accounts of electrical failures sent to Glasforms by its customers–who used Glasforms' insulator

6    rods to produce finished insulators–and the customers of its customers–end-users, such as

7    utilities, that used the finished rods.[2]  Glasforms will rely on the records to prove the details of

8    various failures, including the date and time of failure, the surrounding circumstances, and any

9    notable features of the failure itself.  While Glasforms does intend to call as witnesses several

10   employees of customers Tyco, K-Line, and Dong Ah, it does not intend to call employees of any

11   of its other customers, or of their customers.

12        Defendants argue that with the exception of records that (1) were created by Glasforms

13   or its testifying customers and (2) pertain to failures of which those parties or their agents had

14   first-hand knowledge, the records are inadmissible hearsay.  Glasforms argues that the records

15   may be admitted under the business records exception to the hearsay rule.  *See* Fed. R. Evid.

16   803(6).  The exception applies to records created at or near the time of an event or fact, by or

17   from information transmitted by a person with knowledge, if kept in the course of a regularly

18   conducted business activity, and if such record-keeping was the regular practice of the business.

19   In addition, records created by third parties and incorporated into a business's regularly kept

20   records may be admissible if the incorporating business relied on the records and the records

21   have other indicia of trustworthiness.  Glasforms also argues that the records are admissible

22   under Rule 807, which creates an exception to the hearsay rule for records that do not meet the

23   requirements of Rule 803(6) but have other guarantees of reliability.

24        Defendants make several arguments as to why neither Rule 803(6) nor Rule 807 should

25   apply.  First, they argue that the foundational requirements of Rule 803(6) have not been met at

26   any of the multiple layers of hearsay that are present in Glasforms' proposed evidence.  Second,

27

28        [2] In many cases, the accounts of failures provided by end-users were provided first to
     Glasforms' customers, who in turn transmitted the accounts to Glasforms.

1  they argue that even if Glasforms *theoretically* could rely on incorporated third-party documents

2  that themselves lack a business-records foundation, Glasforms cannot make the requisite factual

3  showing.  Finally, Defendants argue that Rule 807 does not apply because the "extraordinary

4  circumstances" required to trigger its application are absent.  The Court addresses these

5  arguments in turn.

6          **1. Foundational requirements of Rule 803(6)**

7            **a. Contemporaneous recording**

8          Defendants argue that the chain of records offered by Glasforms–from Glasforms itself

9  to the customers of its customers–contains numerous instances of insufficiently

10 contemporaneous record-keeping.  The largest time gap identified by Defendants is seven

11 weeks.  For example, Defendants note that a Glasforms customer apparently learned of a rod

12 failure on October 19, 2007, but did not send Glasforms an email containing the particulars of

13 the failure until November 16, 2007, and that Glasforms in turn did not place the substance of

14 the email into its own complaint form until December 5, 2007.

15         As a general matter, the business records exception is construed generously in favor of

16 admissibility.  *Conoco, Inc. v. Dep't of Energy*, 99 F.3d 387, 391 (Fed. Cir. 1997).  Moreover,

17 Rule 803(6) requires that a record be "made at *or near* the time" of the recorded event–a flexible

18 requirement merely intended to prevent inaccuracy, such as by lapse of memory.  *See*

19 McCormick, Evidence § 289 at 258 (5th ed. 1999).  Thus, in determining whether a record is

20 sufficiently contemporaneous, a court may–and indeed "must[–]take[] [account] of practical

21 considerations," and must not apply the rule "with any technical [rigidity]," as by reference to

22 "arbitrary or artificial time limits . . .  measured by hours or days or even weeks."  *Missouri Pac.*

23 *R. Co. v. Austin*, 292 F.2d 415, 422-23 (5th Cir. 1961).  The timeliness requirement therefore

24 will have been satisfied if a record was made within "a reasonable time" of the relevant event or

25 fact.  *Seattle-First Nat. Bank v. Randall*, 532 F.2d 1291, 1296 (9th Cir. 1976).

26         In the instant case, the fact that on certain occasions it took some interval of time for the

27 end-user of Glasforms' products to document the failure, transmit that information to

28 Glasforms' customer, and then see that information transmitted to Glasforms, does not render

3

1   the records inadmissible.  There is no reason to believe that the lack of immediate recording

2   diminished the reliability of the records, and Defendants do not argue that the records actually

3   are less reliable as a result of any time lag.

4                              **b. Regular course of business**

5          Glasforms intends to offer foundational testimony by its employees with respect to its

6   own record-keeping practices.  It also likely will call witnesses from several of its

7   customers–makers of finished rods such as Tyco, Dong Ah, and K-Line–who will testify as to

8   their own record-keeping practices.  At least as to records kept in the ordinary course of business

9   by Glasforms or its testifying customers, and that pertain to events as to which Glasforms or its

10  testifying customers had first-hand knowledge, any hearsay likely will be excused by the

11  business records exception.  With respect to all other records, however, Glasforms comes up

12  against the well-settled rule that if "the supplier of the information [in the business record] does

13  not act in the regular course [of business], an essential link is broken[,] [since] the assurance of

14  accuracy [that justifies the exception] does not extend to the information."  *See* Fed. R. Evid.

15  803(6), Advisory Committee Note to Paragraph (6); *see also United States v. Arteaga*, 117 F.3d

16  388, 395 (9th Cir. 1997).

17         Glasforms has cited the relevant rule repeatedly, but its citations are conspicuously

18  devoid of any suggestion that it can or will prove that the records provided by primary users of

19  finished rods (i.e., the customers of Glasforms' customers), or by its own customers who will

20  not be testifying, were kept in the ordinary course of business.  *See, e.g.*, Glasforms' Opp. at

21  6:28-7:2 (stating rule without providing analysis); 8:22-9:5 (again stating rule without

22  identifying proof that third-party records were kept in the ordinary course of business).  Thus,

23  while it is true that "[i]f both the source and the recorder of the information, as well as every

24  other participant in the chain producing the record, are acting in the regular course of business,

25  the multiple hearsay is excused," *Wilson v. Zapata Off-Shore Co.*, 939 F.2d 260, 271 (5th Cir.

26  1991), there appears to be no *evidence* that "every . . . participant in the chain producing the

27  record . . . [was] acting in the regular course of business," *id*.; *cf*. Supp. Opp., at 3:25-28 (stating

28  that in the instant case, "everyone in the chain of transmission . . . *presumably* were [sic] acting

4

1   in the regular course of business" (emphasis added)).

2          Glasforms is correct that *United States v. Pazsint*, 703 F.2d 420 (9th Cir. 1983)–the

3   principal case upon which Defendants rely–is unhelpful and easily distinguishable from the

4   instant case.  *Paszint* involved tape-recorded emergency calls to the police that were stored by

5   the police for sixty days.  Applying the familiar principles of multiple-hearsay in business

6   records discussed above, the court reached the unremarkable conclusion that because "the

7   witnesses who gave the . . . recorded [information] . . . were under no business duty to report

8   [that information] . . . . [,] [their] tape-recorded statements can not [sic] be given the

9   presumption of reliability and regularity accorded a business record."  *Id*. at 425.  But

10  Glasforms' ability to distinguish *Paszint* does not establish the converse proposition that a court

11  may *presume* that records were kept in the ordinary course of business merely because those

12  records apparently were made by a business.  Glasforms cites no authority for this proposition,

13  which would appear to obviate the need for live testimony as to a core element of the business

14  records exception in *all* cases.

15         Because Glasforms apparently cannot provide a business records foundation for each

16  level of hearsay it seeks to introduce, the Court must turn to Glasforms' argument that the third-

17  party records may be admitted under the more general "incorporated documents" branch of the

18  business records exception, which allows a court to admit items of multiple hearsay that, while

19  lacking their *own* business records foundation, have other indicia of reliability.[3]

20         **2. "Incorporated records" doctrine**

21         "Rule 803(6) does not require that [a] document actually be prepared by the business

22  entity proffering the document."  *Air Land Forwarders, Inc. v. United States*, 172 F.3d 1338,

23  1343 (Fed. Cir. 1999).  Moreover, it is well-settled that "[a]lthough [an entity's] business

24  records were derived . . . from information provided by outside persons *not under a business*

25  *compulsion*, the business records exception may still apply '[i]f the business entity has adequate

26

27

28         [3] The present discussion of course assumes that Glasforms will be able to establish that its
    own customer complaint forms were kept in the regular course of business.

5

1  verification or other assurance of accuracy of the information provided by the outside [entity].'"

2  *United States v. Sokolow*, 91 F.3d 396, 403 (3d Cir. 1996) (emphasis added) (quoting *United*

3  *States v. McIntyre*, 997 F.2d 687, 700 (10th Cir. 1993)).   There are

> two factors, indicating reliability, that would allow an incorporated document to
> be admitted based upon the foundation testimony of a witness with first-hand
> knowledge of the record keeping procedures of the incorporating business, even
> though the business did not actually prepare the document. The first factor is that
> the incorporating business rely upon the accuracy of the document incorporated
> and the second is that there are other circumstances indicating the trustworthiness
> of the document.

8  *Air Land Forwarders*, 172 F.3d at 1343.

9  ### a. Reliance upon the accuracy of incorporated documents

10   As evidence of systematic reliance upon the accuracy of records received from its

11  customers or their customers, Glasforms first notes that the International Organization for

12  Standardization ("ISO") requires that its members investigate thoroughly the cause of failures

13  and identify a documented corrective action.  Glasforms argues that as a member of the ISO, it

14  "has a substantial interest in the accuracy of its incorporated customer complaint records[,] . . .

15  [since] [i]f the information were inaccurate, a significant amount of valuable time and resources

16  would . . . be[] wasted in . . . fruitless investigation[s]."  Glasforms' Opp., at 4:17-24.

17  Glasforms also notes that "inflated claims of failures could cause Glasforms to unnecessarily

18  strain its relationship with suppliers and/or accept greater responsibility than it ought."  Opp. at

19  4:28-5:2.

20   Defendants counter that Glasforms' incentives changed once Glasforms took the position

21  that Defendants should bear responsibility for the subject product failures.  Defendants point to

22  an email from Glasforms' Technical Vice President dated June 29, 2009, which states: "[N]ow

23  we have to figure out how to present [the issue of graphite contamination in CTG glass] to

24  customer's [sic] & if we can pass liability for this on to CTG."  Defs.' Reply, at 10 (citing Ex.

25  328, at 6277-78).  Defendants note further that by August 26, 2005, Glasforms had sent letters to

26  its customers stating that "[a]fter our exhaustive efforts to determine the cause for these failures,

27  we believe we have found the root cause as trace elements of graphite contaminating the glass

28  fibers as produced by one of our fiberglass suppliers," and that CTG "was aware of their use of

6

1   graphite components in their manufacturing of glass fiber which they represented as suitable for

2   high voltage insulator rods." Defs.' Opp. at 10 (citing GLAS0003-4).

3          While Defendants understandably are concerned that Glasforms developed "motivations

4   to misrepresent," *Hoffman v. Palmer*, 129 F.2d 976, 991 (2d Cir. 1942), the fact "that records

5   might be self-serving has not been a ground for exclusion," Fed. R. Evid. 803(6), Advisory

6   Committee Note to Paragraph (6) (citing Laughlin, Business Records and the Like, 46 Iowa L.

7   Rev. 276, 285 (1961)).  Far more importantly, there are systemic industry-wide interests in

8   accuracy–coupled with potentially severe consequences that would flow from keeping

9   fraudulent or inaccurate records in the face of strict ISO compliance requirements–that allow the

10  Court to conclude with confidence that Glasforms relied sufficiently on the accuracy of the

11  records.

12                    **b. Other circumstances indicating trustworthiness**

13         Glasforms argues the following with respect to the general trustworthiness of the third-

14  party records: First, just as Glasforms relies on records from its customers, those customers

15  "depend on their own records . . . and . . . on . . . incorporated records from utility customers . . .

16  to conduct their own affairs."  Supp. Opp., at 5:4-7.  In that respect,

17              both Glasforms' customers and their utility customers must replace the failed
               insulator, ensure the safety of their employees, determine if their own conduct
18             caused or contributed to the failure, request compensation where appropriate, and
               decide from whom to purchase insulators or core rods in the future.  In cases
19             where Glasforms' customers are investigating and documenting failures suffered
               by their utility customers, they must also protect their valuable relationships with
20             those customers and ensure that they are properly compensated for any problems
               caused by their suppliers.
21
22  Supp. Opp., at 5:7-13.

23         Specifically with respect to the utility companies that use finished rods manufactured by

24  Glasforms' customers, Glasforms observes that those companies "may be presumed to have no

25  motive and little opportunity in the regular course of business to falsely reports of infrequent

26  failures of insulators, particularly given the consequences of events like power interruptions, and

27  the inherent risks and complexities in coordinating false reports and falsifying evidence in the

28  face of inevitable inquiry and investigation . . . . " Supp. Opp., at 5:15-20.

                                              7

1    Finally, Glasforms observes that the incorporated records at issue were provided by a

2   number of independent customers located throughout the world.  Glasforms argues that the

3   general consistency of the reports suggests their reliability and truthfulness, *see Fed. Trade*

4   *Comm'n v. Figgie Int'l, Inc.*, 994 F.2d 595, 608 (9th Cir. 1993), in that there is no identifiable

5   motive for these customers to lie, and no reason to believe that the customer reports are "the

6   product of faulty perception, memory or meaning, the dangers against which the hearsay rule

7   seeks to guard," *id.* (citation omitted).

8    The Court agrees with each of the foregoing propositions.  Defendants suggest, without

9   arguing explicitly, that by informing its customers and their customers of certain issues

10  involving Taishan-manufactured glass, Glasforms tainted these third-parties' record-keeping

11  practices and created incentives to provide inaccurate information.  But as Glasforms argues, the

12  countervailing pressures and incentives would have been far too great for the third-parties to

13  resort to inaccurate or even fraudulent record-keeping practices, as Defendants suggest.  Thus,

14  the Court concludes that both elements of the "incorporated documents" rule have been

15  satisfied, and that Defendants' motion must be denied.

16  **3. Rule 807**

17   In the alternative, the subject evidence is admissible under Rule 807.  The Rule, which

18  generally applies "only in exceptional circumstances," *Ontario Inc. v. Golden State Bancorp,*

19  *Inc.*, 163 F. Supp. 2d 1111, 1120-21 (N.D. Cal. 2001), provides that

20      [a] statement not specifically covered by Rule 803 or 804 but having equivalent
        circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule,
21      if the court determines that (A) the statement is offered as evidence of a material
        fact; (B) the statement is more probative on the point for which it is offered than
22      any other evidence which the proponent can procure through reasonable efforts;
        and (C) the general purposes of these rules and the interests of justice will best be
23      served by admission of the statement into evidence.

24  Fed. R. Evid. 807.

25   Each requirement of the rule is satisfied in the instant case.  First, the statements here are

26  being offered as evidence of a material fact.  Second, they appear to constitute the most

27  probative evidence that can be procured through reasonable efforts.  Forcing Glasforms to obtain

28  visas and translators in order to bring witnesses from each third-party customer to trial would be

8

1   unreasonable and exceedingly impractical.[4]  Moreover, the contemporaneous reports of the

2   third-parties' employees almost certainly are more reliable than any testimony by the employees

3   elicited years after the fact.  *See Figgie*, 994 F.2d at 609 ("[T]estimony from the letter-writers is

4   not likely to be any more reliable than the letters themselves."); *see also Dallas County v.*

5   *Commercial Union Assurance Co.*, 286 F.2d 388 (5th Cir. 1961) (holding that a contemporary

6   report of a fire in a newspaper article was "more reliable, more trustworthy, [and] more

7   competent evidence than the testimony of a witness called to the stand fifty-eight years later").

8   Finally, admitting the records "furthers the federal rules' paramount goal of making relevant

9   evidence admissible."  *Figgie*, 994 F.2d at 609 (citation omitted).  Assuming that the strictures

10  of Rule 803 were interpreted to prevent Glasforms from introducing otherwise reliable evidence,

11  Glasforms would have no way of "proving facts that occurred in remote times and places."

12  Supp. Opp., at 9:2-4.

13      For the foregoing reasons, Defendants motion to exclude hearsay evidence will be

14  denied.

15  **B.    Glasforms' motion to exclude testimony regarding the content of evidence**

16          **destroyed after litigation was anticipated**

17      This motion concerns physical evidence and a series of documents pertaining to

18  Taishan's production processes during the period in 2004 when it manufactured raw fiberglass

19  ultimately sold to Glasforms.  There is no dispute that the following materials and records from

20  that period have been lost, miscategorized, or destroyed: graphite rollers; shift change records;

21  tunnel in/out records; equipment repair records; and equipment maintenance logs.  Glasforms

22  argues that Taishan's destruction of these records violated its duty to preserve evidence in

23  anticipation of litigation.  Glasforms seeks an order excluding all testimony and evidence: (1)

24  that the destroyed documents and things contained no relevant information; (2) that there were

25  no incidents of burning due to conductive contamination in Taishan's RF ovens during the

26

27      [4] In this respect, the vast dispersion of the witnesses and the incredible burden of laying a
    foundation for a very large number of documents by means of live testimony both constitute
28  "exceptional circumstances" that justify the application of Rule 807.

9

manufacture in 2004 of glass fiber later sold to Glasforms; (3) that Taishan's graphite rollers did not suffer wear that caused them to shed graphite particles during 2004; (4) that the shift change records did not reveal problems during 2004 consistent with defects in and/or contamination of the glass fiber; (5) that the sizing applicator and related equipment cleaning records during 2004 did not reveal problems with the sizing consistent with defects in and/or contamination of the glass fiber, (6) that the equipment repair and maintenance logs did not reveal problems with the graphite rollers and gathering shoes during 2004 that could have contaminated the fiberglass at issue, and (7) that Taishan's graphite roller cleaning procedures during 2004 required, and Taishan's practice was, that the graphite rollers were always removed from the manufacturing line and taken to a separate room for any cleaning or other maintenance, instead of being cleaned in place.

On July 2, 2009, Judge Seeborg held that Taishan, acting in bad faith or with a mental state tantamount to bad faith–destroyed numerous documents in each of the document categories upon which Glasforms bases the instant motion.  *See* Order granting in part and denying in part motion for sanctions ("Sanctions Order"), July 2, 2009, at 11:12-14:7.  Consistent with that ruling, the Court has no difficulty concluding that Taishan should not be allowed to present testimony or evidence intended to show that the destroyed documents did or did not contain certain information.  Because the records were destroyed improperly, Glasforms has been deprived of any opportunity to rebut Taishan's contentions with respect to the records' contents.  Thus, Glasforms' motion will be granted with respect to items (4), (5), & (6).  Glasforms' motion also will be granted with respect to item (1), with the proviso that Taishan may attempt to show that the *categories* of documents that were destroyed generally were *less probative* of the issues than those categories of documents that were produced to Glasforms.  *See infra* Section A.1.

With respect to the remaining items–which seek to preclude *all* testimony or evidence on certain subjects, regardless of whether that testimony or evidence stems from any improperly destroyed documents–the Court must evaluate carefully whether Taishan's actions warrant such a harsh and drastic sanction.  Judge Seeborg acknowledged Taishan's argument that it preserved

10

1   "other records far more relevant on the issue of defective fiberglass," but he concluded that

2   irrespective of whether this was true, sanctions were warranted because "Glasforms w[ould]

3   never know the exact relevance of those records as they were destroyed after the anticipated

4   litigation date. . . . " Sanctions Order, at 10:1-4.  That conclusion directly supports Judge

5   Seeborg's decision to require an adverse inference instruction with respect to the destroyed

6   records.  In contrast, if Taishan really did provide Glasforms with evidence that was "far more

7   relevant" to the issue of production irregularities, then Glasforms would be entitled to no more

8   than an instruction addressed directly to the evidence that it does *not* possess, rather than to an

9   order precluding all evidence on a given subject, including probative evidence that it *does*

10  possess.

11          **1. Request (2) for order excluding evidence or testimony that there were no**

12          **incidents in 2004 of contamination-induced burning in Taishan's RF ovens**

13          As Judge Seeborg's order explains, every document category in which Taishan destroyed

14  records of its 2004 production processes offered at least the possibility of direct evidence of

15  whether Taishan experienced irregularities in its RF ovens.  *See* Sanctions Order, at 4:20-6:2,

16  and 9:15-10:4 (discussing relevance of shift change/shift handover records, tunnel in/out

17  records, equipment repair records, equipment maintenance logs, and documents pertaining to

18  experiments with rubber–as opposed to graphite–rollers).  As noted above, Taishan claims that

19  the destroyed evidence simply was less probative than evidence that it did produce to Glasforms.

20  It argues that Glasforms is attempting to use the destruction of less relevant documents as a

21  means of precluding the use of superior evidence that Taishan claims would show the absence of

22  scorching or burning incidents in its ovens.  Taishan points to the following classes of

23  purportedly more-relevant evidence that it apparently produced to Glasforms:

24          – Failed item reports, which are required by the ISO, and which apparently would
            show any significant abnormal phenomenon in manufactured glass products.[5]

25

26  _____

27          [5] These documents, dated between 2003 and 2007, purportedly were produced in response
    to Glasforms' Request for Production No. 40 in Taishan's Response to Glasforms Request of

28  Production, Set 4.

11

– Failed item distribution matrix records, which are required by the ISO, and which apparently identify significant abnormal phenomena in glass manufacturing processes.[6]

– Scrap notification sheets, which show product damage that resulted from unusual causes.[7]

– ISO-mandated product quality data analysis reports, which apparently document events that affect the quality of products manufactured in a particular facility, as well as any reasons for product damage experienced in a given month, the quantity of product lost each month, and customer feedback regarding any product damage.[8]

*See* Zhang Guo Decl., Doc. No. 211, ¶ 5.  Taishan appears not to have provided copies of these materials to the Court, making it somewhat difficult to determine the extent to which the prejudice to Glasforms has been mitigated by the availability of purportedly more-relevant documents.  Nonetheless, the Court still must craft a narrowly tailored sanction that does no more than cure the prejudice to the requesting party and deter future misconduct by the violator.  *See, e.g.*, *Gates Rubber Co. v. Bando Chem. Indus.*, 167 F.R.D. 90, 106-07 (D. Colo. 1996).  In that respect, the Court is satisfied that an adverse inference instruction with respect to the destroyed materials will be adequate.  There appear to be extant examples of each category of destroyed document.  Consistent with the Court's ruling as to item (1), *supra*, the parties may use that evidence to attempt to persuade the jury that one or the other *type* of evidence is (or would have been) the most probative of the issues at hand.[9]  An order precluding all evidence on the issue of whether Taishan experienced production irregularities would "operate in the same fashion as a default judgment" as to that issue, *Gates Rubber*, 167 F.R.D. at 106, and is unwarranted under the circumstances.

---

[6] These documents, dated between 2004 and 2005, purportedly were produced in response to Glasforms' Request for Production No. 41.

[7] These documents, dated between 2004 and 2007, purportedly were produced in response to Glasforms' Request for Production No. 42.

[8] Documents of this category, dated between 2002 and 2007, purportedly were produced in response to Glasforms' Request for Production No. 34.

[9] Of course, consistent with the Court's ruling as to Glasforms' first request, Taishan may not claim that the destroyed documents contained *no* relevant information.

12

1
2

**2. Request (3) for order excluding evidence or testimony that Taishan's graphite rollers did not suffer wear that caused them to shed graphite particles during 2004**

3    The Court currently is considering whether the record adequately supports an adverse

4   inference instruction with respect to Taishan's present inability to identify graphite rollers that

5   were in service in 2004 on the production line used to make glass sold to Glasforms.  That

6   question is a decidedly close one.  Yet even if the Court untimely were to overrule Taishan's

7   objections with respect to the rollers, Glasforms' present request would remain vastly

8   overbroad, in that it might well pre-determine the outcome of the entire trial.  Such a result

9   would lack any proportionate relationship with the loss of some unspecified number of graphite

10  rollers.

11    First, Glasforms is in possession of a sample of one of the rollers it claims was destroyed

12  improperly.  Second, it was never Taishan's practice to sort, catalog, or otherwise track the

13  rollers, which have no identifying marks, and which were and are rotated on and off the

14  production line as needed.  Third, even though, at the time it removed two rollers from the

15  production line, Taishan already had identified graphite as the likely cause of contamination in

16  its internal report, it is difficult to see why it would attach any particular importance to any

17  individual roller or set of rollers from that period.  It is undisputed that Taishan could not have

18  determined precisely which rollers were used to produce glass for Glasforms.  Well before

19  Taishan reasonably could have anticipated litigation, it removed several rollers from its

20  production line because they "might be useful." Zhang Depo. I, at 662:20-23.  Those rollers

21  apparently were several of numerous rollers available that might have been equally likely–or

22  unlikely–to have been in use at the time the subject glass was made, and that might have helped

23  Taishan determine if its rollers were responsible for any contamination.  Neither the fact that

24  those *specific* rollers–which had no special significance–were lost at some unknown time, nor

25  the fact that none of the concededly fungible rollers, *in general*, could be tracked at the time

26  litigation became reasonably probable, gives rise to an inference of culpable conduct that would

27  support the drastic and extraordinary relief sought by Glasforms.

28

1

**3. Request (7) for order excluding evidence or testimony that Taishan's graphite**

2

**roller cleaning procedures during 2004 required, and Taishan's practice was, that**

3

**the graphite rollers always be removed from the manufacturing line and taken to a**

4

**separate room for any cleaning or other maintenance, instead of being cleaned in**

5

**place**

6

As the basis of its request to exclude all testimony or evidence of Taishan's cleaning

7

procedures in 2004, Glasforms essentially points to (1) the existence of written procedures from

8

2007, and (2) Taishan's failure to produce any such written procedure or policy from 2004.

9

Glasforms' request is far too broad.  While Taishan's failure to produce a written policy with

10

respect to the cleaning of rollers in 2004 clearly prevents it from arguing that such a policy

11

existed or tended to show certain facts, the lack of an extant written policy does not warrant the

12

exclusion of other evidence or testimony of 2004 cleaning procedures that might be available.

13

Glasforms' request to exclude, in limine, the written evidence of the 2007 procedures also will

14

be denied.  While it would appear to be unlikely that Defendants will be able to lay an adequate

15

foundation for the 2007 policy, they will have the opportunity to attempt to do so.

16

**C.**   **Defendants' motion to exclude evidence that is the product of Glasforms'**

17

**destructive testing, and that Glasforms has now destroyed**

18

Defendants move to exclude all evidence that is the result of destructive testing of

19

insulator rods by third-party laboratories retained by Glasforms.  Defendants claim that

20

Glasforms' undisclosed decision to order destructive testing of failed rods after litigation

21

reasonably was anticipated–and in many cases after the filing of the instant action–is

22

sanctionable.  The Court carefully has considered the record and the parties' arguments, and

23

while it agrees with Defendants that Glasforms committed serious violations of its duty to

24

preserve evidence, it concludes that wholesale exclusion of the subject evidence is unwarranted

25

because the evidence itself is neither unreliable nor unambiguously favorable to Glasforms, and

26

because Defendants have not made a convincing showing of prejudice.  However, the Court also

27

concludes that Glasforms' conduct warrants a jury instruction indicating, in essence, that

28

Taishan was not the only party to fail in its duty to preserve evidence, and that Defendants were

14

prevented from performing further tests on the samples that were destroyed.

**1. Background**

Even before this litigation began, Glasforms made available to Defendants a not-significant amount of material–both raw fiberglass and samples of failed rods–for inspection and testing.  *See* Order denying motion to compel and for sanctions ("Sanctions Order I"), October 29, 2008, at 5:6-6:1.  Initially, in connection with a preliminary investigation in November 2004 into the cause of the rod failures, Glasforms sent several burned samples to Taishan for review and analysis.  *See* Little Depo, Dunn Decl.,[10] Ex. D, at 102:2-103:14; Peng Depo, Dunn Decl., Ex. C, at 113:23-114:3.  Then, in connection with a January 2005 visit by CTG officials to Glasforms' Birmingham, Alabama, plant, Glasforms provided additional burned rods for testing and analysis by Taishan.  Peng Depo, Dunn Decl., Ex. C, at 100:2-21, 102:6-14.  After litigation had commenced, Glasforms opened its plants for inspection by Defendants.  The first inspection occurred on September 7, 2006 at Glasforms' San Jose, California, facility.  White Decl., ¶ 8.  At this inspection, Glasforms made available to Defendants samples of raw fiberglass, samples of failed insulators, and samples of failed insulator core rods.  White Decl., ¶ 8.  A second inspection occurred on January 23, 2007 at Glasforms' Birmingham plant.  White Decl., ¶ 9.  After the inspection, Glasforms provided the following materials to Defendants: fiberglass samples from all three suppliers used by Glasforms between 2004 and 2006, quarantined raw Taishan fiberglass from 2004, customer-returned insulator core rods containing Taishan glass that had been diagnosed by Glasforms as having a high electrical current leakage, and failed insulators.  White Decl., ¶ 8, 9; Dunn Decl., Doc. no. 160, ¶¶ 15, 31-33, Exs. C, J-L. Also available for inspection was a collection of insulators stored by Dong Ah in a Korean warehouse for potential use in this litigation.  Dunn Decl., ¶ 4.

On August 27, 2008, Defendants requested that Glasforms produce all physical samples of failed products held in its possession.  The request came approximately four years after

---

[10] Unless otherwise noted, reference to the Dunn Declaration in the context of the instant motion refers to Docket No. 304.

15

1   receiving the first samples of failed insulator core rods, two years after the first inspection of

2   Glasforms' facilities, eighteen months after the second inspection, and two days before the fact

3   discovery cut-off.  To justify the apparent lateness of their request, Defendants pointed out that

4   it was not until mid-January 2008, days before they were to take depositions at Glasforms'

5   Birmingham plant, that Glasforms provided any more than vague suggestions regarding

6   apparent failures of rods made with glass from suppliers other than CTG/Taishan.  When

7   Glasforms declined to produce the materials, Defendants filed a motion to compel and for

8   sanctions.[11]  Judge Seeborg denied the motion, concluding that Glasforms had complied fully

9   with all of Defendants' earlier discovery requests, and that their further request for physical

10   evidence was "simply too late."  Sanctions Order I, at 5:19-21.

11       Judge Seeborg was not called upon to address whether Glasforms had complied with its

12   duty to preserve relevant evidence.  In that respect, there appears to be no dispute that Glasforms

13   ordered destructive tests on a large but indeterminate number of failed insulator rod samples.  In

14   some instances, the testing revealed what Glasforms considers to be critically important

15   evidence of graphite contamination.  *See, e.g.*, Sellers Decl., Ex. B-328, at 6277-78 (expressing

16   satisfaction at having found a "smoking gun" in the form of graphite identified on a sample of

17   CTG glass "from production date 10/10/04").  Yet, the destructive testing occurred without

18   notice to Defendants, and although Glasforms claims to have preserved some remnants of the

19   tested samples as well as portions of the failed insulators themselves, the portions on which

20   graphite allegedly was found appear to have been destroyed.

21       **2. Discussion**

22       The Court begins by noting its disagreement with several premises underlying

23   Glasforms' opposition to the instant motion.  First, Glasforms' implied assertion that it did not

24   reasonably anticipate litigation until December 2005, on the eve of the filing of the instant

25   lawsuit, is simply not credible.  An email dated June 29, 2005 and written by Glasforms'

26

27   _____

28   [11] The "sanction" requested was an order requiring Glasforms to disclose exactly what
    materials it had and what materials, if any, had been destroyed.

16

1

Technical Vice President states, with respect to an analytic testing report:

2

3

> Hugh Gotts [of Balazs laboratories] found the 'smoking gun'! He found graphite on the CTG glass, from production date 10/10/04 . . . Eureka!! . . . now we have to figure out how to present this to customer's [sic] & if we can pass liability for this on to CTG.

4

5

Sellers Decl., Ex. B-328, at 6277-78. The content of this message speaks for itself. In addition,

6

Glasforms has identified no justification for assigning it a later preservation date than that

7

assigned to Defendants.

8

Second, the Court rejects Glasforms' argument that only insulator rods made with

9

Taishan-manufactured glass had any inherent relevance. Glasforms argues that because a

10

greater percentage of failures occurred in rods made with Taishan glass than in rods made with

11

other manufacturers' glass, all other failures are irrelevant. Yet, while Glasforms considers

12

Defendants' contrary argument to be "neither intuitively correct nor . . . logical," Glasforms'

13

Opp., at 12:27, it is Glasforms' argument which deserves that label. Indeed, because this case

14

involves the failure of products made using multiple components and a complex manufacturing

15

process, it is at least quite plausible that the process, rather than a component input such as raw

16

fiberglass, was the cause of the problems. Whether that was true here was not a determination

17

for Glasforms to make in the context of its obligations to preserve evidence.[12] *See Leon v. IDX*

18

*Systems Corp.*, 464 F.3d 951, 956-57 (9th Cir. 2006) (affirming imposition of sanctions and

19

noting district court's determination that "[Plaintiff] did not have authority to make unilateral

20

decisions about what evidence was relevant in this case"). Contrary to Glasforms' suggestions,

21

all of the insulator rod failures that Taishan has identified were at least potentially relevant to the

22

instant litigation.[13]

23

24

[12] With respect to the separate issue of whether Glasforms produced evidence that was responsive to Defendants' discovery requests, the Court agrees with Judge Seeborg's assessment that Glasforms did so, particularly given the fact that Defendants framed their requests in terms of the allegations made by Glasforms, which lacked any reference to failures involving non-Taishan glass.

25

26

27

[13] Even assuming that Glasforms' decision to order destructive testing on certain samples *without notifying Defendants* could be excused on the ground that Glasforms preserved all samples that remained of the failed rods, Glasforms has not presented clear evidence that it

28

17

1    Third, irrespective of whether samples of failed insulators made with glass from

2    suppliers other than Taishan were relevant, there is no dispute that samples of failed rods made

3    with Taishan-manufactured glass would be highly relevant and critically important evidence.

4    Glasforms' decision to conduct destructive testing on these materials was a flagrant violation of

5    its duties as a litigant.  Indeed, even if a party "*cannot* fulfill [its] duty to preserve [evidence] . . .

6    , [it] still has an obligation to give the opposing party *notice* of access to the evidence or of the

7    *possible* destruction of the evidence if the party anticipates litigation involving that evidence."

8    *Silvestri v. General Motors Corp.*  271 F.3d 583, 591 (4th Cir. 2001) (emphasis added); *see also*

9    *Graff v. Baja Marine Corp.*, 310 Fed. Appx. 298, 301 (11th Cir. 2009) (unpublished) (affirming

10   exclusion of testing evidence where "an individual acting at [the] direction [of plaintiffs'

11   metallurgist] conducted destructive tensile tests on a portion of [a boat's] gimbal housing

12   without notifying the manufacturers").  Nor does it matter that the tests were destructive of only

13   a portion of the failed rods.  *See 103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 988 (10th

14   Cir. 2006) (affirming exclusion of testimony based on physical evidence where, "without notice

15   to the defendant, plaintiff threw away fifty to sixty feet of the busway and saved only four feet,"

16   which portion did not contain the critical evidence).  As already noted, key evidence appears to

17   have been generated from the portions that no longer exist.[14]

18       Notwithstanding the serious nature of Glasforms' destruction of relevant or potentially

19   relevant evidence, there are multiple factors that counsel against exclusion of the test results or

20

21   _____

22   retained intact samples or post-testing remains of failed insulator rods.  Glasforms relies
     principally on the declaration of Barry White to establish that it did not knowingly destroy any
23   evidence.  But the White declaration states merely that "Glasforms . . . retained *numerous*
     samples returned burned rods containing CTG glass," that it "retrieved and kept remnants of
24   *some* independently tested samples," and that it "has retained most, but not all, samples of failed
     insulators made from other suppliers' fiberglass on an 'as needed' basis for its ongoing
25   investigations of those failures."  White Decl., ¶¶ 5-6 (emphasis added).  This imprecise
     explanation of Glasforms' approach to the preservation of evidence is insufficient.
26

27       [14] Glasforms has identified one instance of unannounced destructive testing of rod
     samples by Defendants, *see* Guo Depo., Dunn Decl., ¶ 7, Ex. E, at 352:17-19, but there is no
28   evidence that such testing was anywhere as systematic as that engaged in by Glasforms.

18

1    of testimony based on those results.  First, it is beyond reasonable dispute that the test results,

2    which were generated by independent and reputed laboratories, are legitimate and potentially

3    highly probative evidence of what caused the failures at issue.  While Defendants complain that

4    they lacked an opportunity to participate in or replicate the testing performed on the subject rod

5    samples, Glasforms itself did not participate in the tests.  The testing was conducted primarily

6    by Air Liquide's Balazs Analytical Services, a well-known independent laboratory.  Defendants'

7    own expert, Dr. Viktor Hadjiev, testified that he would not have considered it helpful to run

8    additional tests on the materials tested by Balazs

9    
10          because the whole information that I need was within these reports. . . .  I'm
      familiar with the particular spectroscopic instruments both companies use to
      produce these reports.  Balazs is using [a] Renishaw spectrometer, and I work
11    with Renishaw equipment in Max-Planck Institute and also Rice University here.
      So I'm quite familiar with the particular models of Renishaw instruments that
12    Balazs used. . . .  And I'll say it again, because I know very well these two
      instruments, I know very well what might be in most cases the reason of some
13    artifacts during the measurements, so I didn't . . . need at that time to do additional
      measurements on the sample.

14   Hadjiev Depo, Dunn Decl., ¶ 19, Ex. Q, at 81:15-84:23.  Defendants also were given the

15   opportunity to depose representatives of the independent laboratories that conducted the

16   analysis, and they did so in the case of Balazs.[15]

17          More importantly, while Defendants could not be expected to know precisely what

18   would have been revealed by additional tests, there is little indication that Defendants would

19   have conducted any additional testing.  Rather than request additional samples for testing,

20   Defendants provided to their experts the samples that had been produced by Glasforms, and

21   requested that the experts perform various forms of analysis.  *See*, e.g., Dunn Decl., Exs. P, U;

22   *see also* Gorur Depo, Dunn Decl., Ex. R at 35:19-38:5 & 213:1-4; Karady Depo, Dunn Decl.,

23

24

25

26          [15] Nor do the test results appear unambiguously, or even clearly, to favor Glasforms'
27   position.  *See* Defs.' Mot. for Sanctions, at 6 n.2 (arguing, based on expert report, that results of
     Raman analysis suggest presence of "disordered carbon" as opposed to far more conductive
28   graphite).

                                                    19

1    Ex. M, at 197:9-24.[16]  Defendants also did not inspect or seek testing of the insulators stored in

2    Dong Ah's Korean warehouse.  Dunn Decl., ¶ 4.  Similarly, and even more importantly, it was

3    not until *after* oral argument on the instant motion that Defendants even suggested that there

4    were other available tests that might have produced results better or even different from those

5    produced by the tests ordered by Glasforms.  Even now, Defendants have provided no more than

6    a list of "additional tests that could have been done," without explaining the particular

7    capabilities of those tests.  In that respect, the Court again emphasizes that while Defendants

8    cannot be faulted for their ignorance of the *specific facts* that any further tests might have

9    revealed, *cf. Marrocco v. General Motors Corp.*, 966 F.2d 220, 223 (7th Cir. 1992) (finding it

10   "ironic that the plaintiffs also contend that [the defendant] has not adequately explained what an

11   intact bearing assembly would have shown, [since] it was the plaintiffs' own misconduct which

12   prevented [the defendant] from acquiring that very information"), it is entirely reasonable to

13   require that Defendants explain whether any tests they might have conducted *could* have

14   produced results better or different from the independently derived results that *are* available.

15   The requirement of such a showing is particularly justified here, where it appears that

16   Defendants demonstrated little interest in conducting root-cause testing on the samples made

17   available to them.  *See supra*.

18       "While a district court has broad discretion in choosing an appropriate sanction

19   for spoliation, 'the applicable sanction should be molded to serve the prophylactic, punitive, and

20   remedial rationales underlying the spoliation doctrine.'" *Silvestri*, 271 F.3d at 590 (citing *West v.*

21   *Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2nd Cir. 1999)).  Here, the Court faces a

22   situation in which (1) Glasforms clearly breached its duty to preserve evidence, but (2)

23   Defendants have made a weak showing of actual–as opposed to hypothetical–prejudice, and (3)

24   at issue are large quantities of independently derived testing data that may constitute the best

25   scientific evidence available.  To address this situation, the jury will be instructed that

26

27       [16] In light of Defendants failure to test the materials, it is perhaps not surprising that in
     requesting the additional materials from Glasforms at the close of discovery, Defendants did not
28   provide any explanation of their purported need for the materials.  *See* Dunn Decl., Exs. J-K.

20

1    Glasforms, in violation of its duties as a litigant, ordered sometimes-destructive testing of

2    samples of failed insulator rods without notifying Defendants.  The jury will be instructed

3    further that it is not required to draw any adverse conclusions as to the validity of the test results

4    that were generated, since the tests were conducted by independent laboratories.  However, the

5    jury will be told that as a result of Glasforms' conduct, Defendants were unable to perform their

6    own tests on the destroyed samples.

7        Beyond these instructions, there will be no further reference to the legal propriety of the

8    destructive tests, except by the parties in closing argument, if they so choose.  The parties may

9    elicit testimony on the subject of the relative strengths and weaknesses of the tests that *were*

10   performed viz-à-vis those that could not be performed.  Similarly, Defendants may elicit

11   testimony as to whether the Raman or other tests ordered by Glasforms were sufficiently likely

12   to identify failure causes other than graphite–causes such as dry glass, voids, or the presence of

13   thermocouple wire.  Finally, Glasforms may elicit testimony on the subject of whether or not

14   Defendants *did* perform any such testing on samples that were provided to them.[17]  The parties

15   are directed to submit proposed instructions to the Court not later than August 10, 2009 at 5 PM

16   PDT.

17   **D.    Defendants' motion to exclude testimony of previously undisclosed witnesses**

18        Defendants move to exclude the testimony of Tony Carreira, Dr. Zi Li, Todd Jones, and

19   John Menzel.  As the Court stated at the pretrial conference held on June 26, 2009, the

20   testimony of Todd Jones and John Menzel will be permitted in rebuttal only.  With respect to

21   Dr. Li and Tony Carreira, it is apparent that Defendants' objection is aimed less at these

22   witnesses' testimony than at an experiment to which their testimony would refer.  The

23   experiment, in which an insulator rod was "salted" with graphite, was conducted after all initial

24   and rebuttal expert reports had been exchanged.  The experiment was disclosed to Defendants in

25   materials they received in advance of their deposition of Glasforms expert Dr. John Moalli, and

26

27        [17] These categories of testimony and evidence are merely illustrative.  As with all of the
     Court's present conclusions, the scope of permissible testimony and evidence is subject to
28   revision at trial.

21

1  Defendants did not question Dr. Moalli about the experiment.  However, the Court agrees that

2  Defendants were under no obligation to do so since the experiment was not timely disclosed.

3  For that reason, the experiment is inadmissible and Dr. Li's and Mr. Carreira's foundational

4  testimony with respect to the experiment will be excluded.

5

6  **IT IS SO ORDERED.**

7

8  DATED: 7/30/09

9

10  _____
    JEREMY FOGEL
11  United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 06-3359 JF (RS)
ORDER RE MOTIONS IN LIMINE
(JFLC3)

1    This Order has been served electronically upon the following persons:

2    April E. Sellers     april.sellers@bakerd.com

3    David K. Herzog     david.herzog@bakerd.com

4    Eugene Ashley     eashley@hopkinscarley.com, ihernandez@hopkinscarely.com,

5    ihernandez@hopkinscarley.com, jdooley@hopkinscarley.com

6
     Jennifer M. Phelps     jennifer.phelps@bakerd.com, debora.schmid@bakerd.com
7

8    Kevin M. Toner     kevin.toner@bakerd.com, judy.ferber@bakerd.com

9    Lisa J. Cummins     lcummins@campbellwarburton.com

10   Noelle Dunn     gcordova@hopkinscarley.com, ndunn@hopkinscarley.com

11
     Robert A. Christopher     rchristopher@hopkinscarley.com, ihernandez@hopkinscarley.com
12

13   Sophie N. Froelich     sfroelich@nossaman.com, ntorpey@nossaman.com

14   Tod C. Gurney     tgurney@hopkinscarley.com

15   Notice has been delivered by other means to:

16
     Glasforms Inc.,
17   William Whitcom Faulkner

18   McManis, Faulkner & Morgan
     50 West San Fernando St., Suite 1000
19   San Jose, CA 95113

20

21

22

23

24

25

26

27

28

Case No. C 06-3359 JF (RS)
ORDER RE MOTIONS IN LIMINE
(JFLC3)